Robert D. AUNGST, Plaintiff–Appellant,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Defendant–Appellee.

No. 90–1849.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1990.

Decided July 22, 1991.

Henry J. Price, Robert G. Barker, Sharon L. Groeger, Price & Shula, Indianapolis, Ind., for plaintiff-appellant.

Jay R. Larkin, Kenneth J. Yerkes, Barnes & Thornburg, Indianapolis, Ind., for defendant-appellee.

Before CUDAHY, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

Engineer Robert D. Aungst, a 35–year Westinghouse employee, was terminated in 1983 during a reduction in force (RIF). He brought this action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., alleging that Westinghouse: 1) terminated him because of his age; 2) refused to rehire him because of his age; and 3) retaliatorily refused to rehire him because he had filed an age discrimination claim with the Equal Employment Opportunity Commission (EEOC). Judge Noland granted summary judgment for Westinghouse on the latter two claims, holding they were barred by the statute of limitations. A jury found for August on the unlawful discharge claim, concluding that Westinghouse willfully discharged him in violation of the ADEA. However, Judge

Noland, in a thorough and persuasive opinion, granted Westinghouse's motion for judgment notwithstanding the verdict (JNOV), holding that the evidence was insufficient to prove pretext and to support the jury's verdict of willful discrimination. Aungst appeals all of the district court rulings. We affirm.

### I.

Aungst graduated in 1948 from Pittsburgh's Carnegie Institute of Technology with a bachelor's degree in electrical engineering, and immediately went to work for Westinghouse. After 10 years in East Pittsburgh, he was transferred to the Bloomington, Indiana plant, where he remained until his termination at the end of 1983.

Aungst worked with capacitor units, which are used by utilities in the transmission and distribution of electric power. Although he briefly worked with protective devices in 1949, that same year he was permanently assigned to the capacitor section and began designing capacitor units. He eventually found his niche in designing the "Autotrol," a particular kind of capacitor. Autotrol is a Westinghouse trade name for a polemounted capacitor unit. Autotrols are one of the least complicated forms of capacitor, and Aungst apparently mastered their design quickly. As he continued designing Autotrols year after year, he became comfortable with the nickname "Mr. Autotrol." His very infrequent forays into working on more complicated capacitor units were not always successful.

Aungst was a customer order Autotrol engineer, which meant that he assembled existing devices and components into a design that met customer specifications. By contrast, fundamental development or design engineers hypothesized, created and tested new uses for capacitors. The customers Aungst dealt with were utility companies. These companies generally would specify in detail the type of Autotrol they desired, and Aungst would then assemble the Autotrol to their specifications.

Pursuant to a 1983 company-wide reorganization, the Westinghouse Bloomington facility was ordered to make a 10 percent across the board reduction in "managed costs," thus requiring substantial reductions in its staff of 155 salaried employees. The Bloomington plant was restructured by William Westlake, the plant and division manager. He named Frank Frederick, formerly manager of the marketing department, to manage the new capacitor department, and Frederick was ordered to make staff reductions in both his old and new departments. In the marketing department, Frederick decided to terminate two employees who were each under 30 years old. In the capacitor department Frederick selected Aungst for termination. He discussed his decision with Don McClain, who managed the capacitor equipment and engineering section from 1975 to 1983, and John Brittain, engineering department manager from 1958 to 1983, and neither disagreed with the choice. Frederick claims to have wanted more versatility in the department; he concluded that although Aungst's work performance with Autotrols was good, he was the least versatile and creative engineer in the department, and his tasks were the easiest to perform. He also was aware that Aungst had more problems with employees on the shop floor than other engineers. Aungst was 60 years old at the time of his termination. Overall, during the Westinghouse RIF of December 1983, 15 employees were terminated. Eight were in the ADEA's protected age group (between age 40 and 70), seven were not.

Frederick chose Tom Wilkinson, also a 60–year–old engineer with an even longer tenure at Westinghouse and a higher salary than Aungst, to replace Aungst in responding to Autotrol orders. Wilkinson also continued to perform his other engineering responsibilities. Wilkinson worked on Autotrols until his retirement in 1986, and even after retirement was frequently used as a consultant. John Warkentin, 51, backed Wilkinson up on Autotrol orders. Warkentin's old job in another division was eliminated during the RIF, so Frederick brought him into the new capacitor department, where he spent about half his time

on customer order engineering, including Autotrols. Two younger engineers were retained by Frederick: Steve Seaton, 27, and Joe Kile, 25. Both were fundamental development or design engineers, and neither worked on Autotrols.

Frederick made a number of other employment decisions during the reorganization, some of which resulted in older employees being retained over younger employees. The net result was this: prior to the reorganization, eight of 12 engineers in the capacitor department were in the ADEA's protected age group; after the reorganization, 11 of 14 were in the protected age group. (The capacitor department had been one of six divisions in the Transmission and Distribution Business Unit. Those six divisions were combined into three divisions during the reorganization, which explains why the new capacitor department had two more members despite the reduction in force.)

After Frederick told Aungst he was being terminated, Aungst met with Joe Kennedy from Westinghouse headquarters. Kennedy accepted a resume from Aungst for the Westinghouse placement service, and told Aungst the placement rate for discharged workers seeking employment was between 75 and 85 percent. Aungst's resume remained in the Westinghouse placement booklet for nine months, but no one inquired about his availability.

Shortly after his discharge Aungst filed a charge of discrimination with the EEOC on December 16, 1983. In 1985, while attending a regular weekly luncheon with retired and current Westinghouse engineers, Aungst gained access to an internal memorandum dated March 29, 1985, which listed two new engineers in the capacitor department. Another new engineer was hired in September 1985. Aungst claims he did not have knowledge that these three younger engineers were hired until November 8, 1986, when Wilkinson told him of the hirings. On November 13, 1986, Aungst filed additional charges with the EEOC, alleging that Westinghouse discriminatorily refused to rehire him.

A jury determined that Westinghouse willfully discriminated against Aungst by choosing him for the RIF. Aungst appeals from the district court's decision to grant Westinghouse's JNOV motion. He also appeals the district court's decision to grant summary judgment for Westinghouse on Aungst's refusal to rehire claims.

## II.

### A. *Discriminatory Discharge Claim*

Under the ADEA, it is unlawful "for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against an individual ... because of such individual's age." 29 U.S.C. § 623(a). When reviewing an age discrimination case, a court must decide "whether there was sufficient evidence for a reasonable jury to find that age was a determining factor," or "in other words, a 'but-for' cause" of the employer's decision to fire the plaintiff. *Brown v. M & M/Mars*, 883 F.2d 505, 507 (7th Cir.1989). "[A] terminated plaintiff's ultimate burden in an age discrimination case is to prove that he was discharged because of his age." *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988), citing *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). But Aungst must clear another hurdle in this case—he must also prove that the decision by Westinghouse to unlawfully terminate him was made "willfully." That is because Aungst concededly did not bring this claim within two years of the firing; the ADEA provides that an action "may be commenced within two years after the cause of action accrued ... except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued...." 29 U.S.C. § 626(e)(1); 29 U.S.C. § 255.

We review *de novo* the district court's decision to grant judgment notwithstanding the verdict. We take the evidence and all reasonable inferences from it in the light most favorable to Aungst, the non-moving party. While we do not reweigh the evidence, we do determine " 'whether the evidence is *substantial;* a mere scintil-

la of evidence will not suffice.'" *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 15 (7th Cir.1987), quoting *LaMontagne*, 750 F.2d at 1410 (emphasis in original). In this case, therefore, Aungst needed to provide substantial evidence that Westinghouse willfully violated the ADEA. Before we discuss the separate, added burden on Aungst to prove willfulness, we first will address the question of whether there is any age discrimination here at all.

Aungst contends that he put forth sufficient evidence to support the jury's verdict of willful discrimination. Westinghouse concedes that Aungst made out a prima facie case of age discrimination under the burden-shifting method of proof for Title VII cases described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later applied to ADEA cases. *See Ayala v. Mayfair Molded Products Corp.*, 831 F.2d 1314, 1318 (7th Cir.1987). Aungst proved that he: 1) was within the protected class; 2) was performing his job to the employer's satisfaction; 3) was terminated; and 4) others not in the protected age group were treated more favorably. *See Oxman*, 846 F.2d at 455.

This shifted the burden of production to Westinghouse to show a legitimate, non-discriminatory reason for Aungst's termination. Once a plaintiff proves a prima facie case, "a rebuttable presumption of discrimination arises and the burden shifts to the [employer] to articulate a legitimate non-discriminatory reason for the discharge. This burden, however, is merely a burden of production ... that is not difficult to satisfy." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463 & n. 5 (7th Cir.1986), *cert. denied* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987), citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). In *Burdine*, the Supreme Court described the burden of production this way: "The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against

the plaintiff." We must give the employer the benefit of the doubt regarding its explanation of employment decisions.

> With respect to [an employer's] explanation for [an employee's] discharge, we again note that we do "not sit as a super-personnel department that reexamines an entity's business decisions." ... "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere." ... "Rather, our inquiry is limited to 'whether the employer gave an honest explanation of its behavior.'"

*Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted). Westinghouse offers several lawful reasons for the termination, while pointing out that the firing occurred only because of a reduction in force. First, Westinghouse argues that Aungst was replaced by someone his own age, and that the only younger engineers retained were performing work that Aungst did not do and could not have done, even with retraining. Second, due to the RIF, Westinghouse was forced to make do with fewer engineers, and needed more versatility. Westinghouse argues that Aungst, who worked almost exclusively in Autotrol production for many years, was the least versatile engineer.

Given the explanation produced by Westinghouse, Aungst now had to "prove by a preponderance of the evidence that the reasons offered by [Westinghouse] were not its true reasons but were merely a pretext for discrimination." *Graefenhain*, 827 F.2d at 18, citing *Burdine*, 450 U.S. at 255 & n. 10, 257, 101 S.Ct. at 1095 & n. 10, 1095–96. Aungst was required to disprove each of these "specific explanations" for Westinghouse's actions. *See Dale*, 797 F.2d at 464. Further, "in cases of corporate reorganization a plaintiff must come forward with 'additional direct, circumstantial, or statistical evidence that age was a factor in his termination....'" *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 941 (6th Cir.1987), quoting *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir.1986). "[A]n ADEA plaintiff who has been terminated

amidst a corporate reorganization carries a greater burden of supporting charges of discrimination than an employee who was not terminated for similar reasons." *Ridenour,* 791 F.2d at 57.

At trial Aungst argued that Westinghouse's stated reasons for firing him were mere pretexts for a desire to willfully discriminate against him because of his age. The jury agreed, but the district court concluded that "[t]he verdict returned by the jury is against the clear weight of the evidence. Reasonable persons could not arrive at a verdict against the defendant." As Judge Noland put it, "[t]he evidence presented by Aungst cannot establish that Frederick's decision to terminate Aungst was a willful violation of the ADEA, or even that his articulated reasons were pretextual." We agree, and therefore affirm the district court's decision to grant the motion of Westinghouse for JNOV.

■ Leaving willfulness aside for a moment, just to prove basic age discrimination Aungst needed to do more than make out a prima facie case. He needed to prove that Westinghouse's alleged reasons for choosing him for termination during the RIF were mere pretext. In *LaMontagne,* we suggested three ways a plaintiff could prove his case. Applying those, Aungst needed to prove that Westinghouse's alleged reasons had no basis in fact, or if they did, that they were not really factors motivating the discharge, or if they were, that they were jointly insufficient to motivate the discharge. *LaMontagne,* 750 F.2d at 1414–15. We turn now to an examination of the evidence Aungst believes supports his allegation of pretext.

■ Aungst first argues that the district court wrongly concluded Frederick was the sole decisionmaker. He relies on Frederick's statement that John Brittain, the engineering department manager, "key staff people" and "other managers" were involved. This contention is without merit. Frederick's lengthy testimony made clear that he was the sole person responsible for selecting Aungst for termination, although in the process of making that decision he certainly consulted with Aungst's immedi-

ate supervisors. Frederick described in detail how Westlake, the plant manager, chose him to make the reduction decisions. He also described in detail his reasons for choosing Aungst; after he made the decision he informed Brittain, who agreed with the selection. Because Frederick was indisputably the sole decisionmaker, the district court was correct to give no weight to a statement allegedly made by the EEOC officer, Robert Dyer, that Westinghouse felt a "moral obligation" to its younger engineers. (Dyer strongly denied making any such statement.) Statements made by inferior employees are not probative of an intent to discriminate by the decisionmaker. *See Oxman,* 846 F.2d at 456–57, discussing *LaMontagne,* 750 F.2d at 1412. That Frederick was the sole decisionmaker will also be important for other reasons, relating to willfulness, that we shall discuss later.

■ Because there is no "smoking gun" evidence that Frederick willfully fired Aungst because of his age, Aungst must rely on the indirect method of proof to show pretext. In essence, he must disprove Westinghouse's primary reason for choosing him for the RIF—lack of versatility. Under the three-part analysis from *LaMontagne,* Aungst must show that Frederick was not really concerned with versatility, or that if he was, Aungst was fired for reasons other than lack of versatility. If lack of versatility was the actual reason, Aungst must show that lack of versatility should not have caused Aungst to be chosen for the RIF. In other words, after Westinghouse met its burden of producing reasons for the discharge, the burden of proof remained with Aungst, but now he needed to do more than merely restate his prima facie case. He needed to come up with some evidence to disprove the legitimate explanations offered by Westinghouse. After reviewing the evidence, we agree with the district court that Aungst did not provide any evidence, other than his own self-serving testimony, that he was fired for reasons other than those stated by Westinghouse through its decisionmaker, Frank Frederick.

Aungst presents no evidence to counter Frederick's lengthy testimony regarding the need for versatility, or to show that Aungst was actually fired for reasons unrelated to versatility. Westlake ordered Frederick to make reductions in the capacitor department. Frederick described his criteria for decisionmaking:

I think any time you have to reorganize or perform a function with fewer people, really the first question you ask yourself is who do I have to keep? ... So, those become the very easy decisions, who must I keep, because of the very specialized and detailed knowledge that they may have. And then with individuals that are left you look and see what other functions now need to be performed and what is the best way to do it with the limited number of people that you have left, and how can you organize the people you have left, or may have left, to perform the additional functions.

Frederick then discussed his decision to emphasize diversity within the capacitor department:

I wanted to get away as much as I could from specialization in engineering. From my experience in marketing I well understood the fact that customers don't always buy the same amount of equipment every day and every week and every month, they purchase in a cyclical fashion. And we had to have the capability of handling those orders in a cyclical fashion, and having people who had diverse capability was essential to handling those orders in a cyclical fashion. So, I wanted diversity as much as I could get it in the engineers.

Finally, Frederick responded to a series of questions relating to his decision to select Aungst for the RIF, while retaining two younger engineers in another engineering department:

Q. Frank, based on all the information that you had available to you in December of 1983, why was Mr. Aungst selected for reduction and the others retained within the capacitor section in December, 1983?

A. Because the criteria that I felt I needed in the Capacitor Department included the characteristics of diversity, things like creativity, a good overall working relationship with everyone that you have to associate with, including the factory experience was important. It is just that I felt Mr. Aungst's experience was very narrow in focus and we needed broader experience. There is no denying that he had a lot of experience in—many years of experience in autotrols. It is just that that experience needed to be broader, and it was not broader.... I needed the most creative and diverse and flexible and experienced individuals that I could find. With the exception of experience in autotrols, which was more narrow than I really needed, Mr. Aungst was the least capable individual that I had remaining and, therefore, chose him, based on those factors, for reduction in force.

Q. What about Mr. Kile and Mr. Seaton? They ended up in the capacitor equipment development section. Would Mr. Aungst, if he had been retained, would he have been retained in this equipment development section?

A. No.

Q. He would have been retained [in the capacitor order section]?

A. That's correct.

Q. What factors did you evaluate in determining to retain Mr. Kile and Mr. Seaton within the capacitor equipment development section in December of 1983?

A. They were both doing development work. Steve Seaton was doing development work on capacitor units. In the year and a half that he had been there he had proven to be a very capable individual.... He was a very diverse and creative engineer.... The same can pretty much be said for Joe Kile, although he was doing development work in fuses, switches, and in some cases, bushings.... Very aggressive, very creative, dynamic, again good electronic skills that we felt could help us in our other product lines, particularly series, in the future.

So, based on the experience we had with those individuals, the background, the work they had shown, the creativity and diversity that they had shown they were capable of achieving, we felt that we needed them in those positions and they could do it better than Mr. Aungst could.

Q. To your knowledge, did Mr. Aungst have any experience in fuse design?

A. No, sir.

Q. To your knowledge, did Mr. Aungst have any experience in capacitor fundamental development on units?

A. No, sir.

So Frederick's testimony established that: 1) versatility was his most important criterion for decisionmaking; 2) he thought Aungst was the least versatile engineer; 3) Aungst worked in customer order engineering, and the two younger engineers were in a completely separate section doing separate work; and 4) he did not think Aungst had any experience doing fuse design or fundamental development. Other testimony and documentary evidence established that when Aungst departed, his Autotrol work in the customer order section was divided among two engineers within the ADEA's protected age group, both of whom performed other work and were more versatile than Aungst. Further, Aungst's superiors testified that they did not believe he had the expertise to do more complicated work, and that even with further training, he would not have been able to do the work performed by Seaton and Kile. Aungst himself testified that he had never done fuse design, and had not worked on capacitor unit design since 1963.

■ Aungst had the burden to counter Westinghouse's "specific explanations" for its decision in a manner that showed these factors were mere pretext for age discrimination. Not only did he not meet that basic burden, he certainly did not meet the "greater burden" of specific evidence of pretext required in a reorganization or RIF case. *See Ridenour*, 791 F.2d at 57; *Simpson*, 823 F.2d at 941. Aungst testified that he could have performed fundamental development or fuse design work, but a plaintiff's self-serving testimony regarding his own ability is "insufficient to contradict an employer's negative assessment of that ability." *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 924 (7th Cir.1988), discussing *Dale*, 797 F.2d at 464–65. Aungst also introduced evidence of: a merit pay increase shortly before his termination; Performance Management System charts that described his good work performance; and a letter of recommendation written by his former boss to help him in an application for a teaching position. However, none of these pieces of evidence responds to Westinghouse's reasons for terminating him—the need for versatility in the context of a reduction in force. Westinghouse never argued that Aungst was an incompetent Autotrol engineer; to the contrary, his work performance and experience in that narrow area were generally considered an asset. "[T]o show pretext, it does not help for [the plaintiff] to repeat the proof that his job performance was generally satisfactory. That question has already been resolved in his favor. The Company advanced specific reasons for his discharge, and his rebuttal evidence should be focused on them." *La-Montagne*, 750 F.2d at 1414. As Judge Noland put it, "[a]ny inference of discrimination which the plaintiff may have raised was dissipated by the defendant's proffered justification. The court finds no proof that employees of any age with similar work credentials were accorded more favorable treatment."

■ Finally, and significantly, Aungst does not come close to meeting the higher standard necessary for a willful violation of the ADEA—that Westinghouse "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Brown*, 883 F.2d at 512. An employer's conduct is not "willful" when the employer acts reasonably in determining its legal obligations, or even when it acts unreasonably, so long as its conduct is not reckless. *Coston v. Plitt Theaters, Inc.*, 860 F.2d 834, 836 (7th Cir.1988), quoting *McLaughlin v. Richland Shoe Co.*, 486

U.S. 128, 108 S.Ct. 1677, 1682 n. 13, 100 L.Ed.2d 115 (1988). Willfulness usually means "conduct that is not merely negligent." *McLaughlin*, 108 S.Ct. at 1681. Frederick was the sole decisionmaker, so Aungst needed to show Frederick's intent to recklessly flaunt the ADEA's requirements. Yet, as we have already discussed, the uncontroverted evidence shows that: Frederick divided Aungst's work between two engineers who were within the ADEA's protected class; the average age of engineers in the capacitor department went up after the reorganization; Frederick made a number of other employment decisions that benefited older employees over younger employees;[1] and, Frederick, who began working with the engineering capacitor department in 1980, was not aware that Aungst had ever done development work, and did not believe Aungst could work with fuse design or fundamental development. There is no evidence from which the jury could conclude that Frederick willfully violated the ADEA in selecting Aungst for the RIF. We reiterate that Aungst in this case must provide evidence beyond that which would prove an ordinary claim of age discrimination. Even assuming that Aungst could prove that Westinghouse unlawfully terminated him because of his age, he would *not* win this case. That is because Aungst has failed to present *any* evidence that Frederick sought to willfully fire him because of his age, in reckless defiance of the ADEA. Age discrimination is not necessarily willful, and plaintiffs who wait until nearly three years beyond the alleged discrimination should be warned that the statute requires more evidence, specifically relating to the intent and knowledge of the employer, in order to prove that an ADEA violation was willful. Aungst had no evidence of that sort here.

Aungst appears to have been a reliable, loyal employee of Westinghouse for 35 years. But the ADEA is not a tenure statute; a plaintiff must show that his age was the cause of his termination. "[T]he age discrimination law does not protect an older employee from being fired without good cause. It protects him from being fired because of his age." *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (en banc) (citations omitted). We repeatedly have warned that "[w]e will not reevaluate business decisions made in good faith." *Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1285 (7th Cir. 1987), citing *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210 (7th Cir.1985). "It is enough if the decision was 'genuinely and honestly made in an attempt to select the employees to be retained on the basis of performance related considerations.' *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1426 (7th Cir. 1986)." *Bechold*, 817 F.2d at 1285. Aungst failed to provide any evidence to counter Westinghouse's reasons for choosing him for the RIF.

By failing to meet the burden of proving age discrimination, Aungst necessarily has fallen far short of proving the higher "willful" standard by additionally showing that Westinghouse terminated him when it knew or showed reckless disregard for the ADEA's requirement that age not be a determining factor in the termination decision. We agree with Judge Noland's conclusion that "no jury could reasonably conclude that age was a determining factor in the decision to terminate Aungst's employment." The district court therefore correctly granted JNOV for Westinghouse.

### B. Discriminatory Refusal to Rehire Claims

Prior to trial the district court granted Westinghouse's motion for summary judgment on Aungst's claims for discriminatory failure to rehire and retaliatory failure to rehire. Aungst claimed Westinghouse discriminated against him because of his age,

---

**1.** "As part of the reorganization, Frederick brought Bud Harman (58) into his department to manage the Capacitor Order section. Dan Kesselich (59), Richard Crowe (57), and Jack Brankle (45) were brought into the department as industrial engineers. Frederick also brought in John Warkentin (51) as the Value Improvement Coordinator and as a back-up to Wilkinson on autotrols. Each of these moves favored older employees over younger ones." (District court opinion at 6.)

and then retaliated by not rehiring him because he had filed a complaint with the EEOC. Instead it hired three younger engineers in 1985. The district court held that Aungst's rehire claims were barred because he did not file a charge with the EEOC within 180 days of the alleged discriminatory act.

■ On appeal Aungst argues that he did not have knowledge of the new hires until November of 1986, and that he promptly filed his EEOC charge the next week. He also argues that we should apply equitable tolling principles to extend the 180–day requirement because Westinghouse induced Aungst to not take action by its promise to help him find another job. We agree with the district court's conclusion that these claims present no genuine issues of material fact, and affirm the court's grant of summary judgment for Westinghouse.

This court outlined the requirements for filing a timely age discrimination claim in *Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 410 (7th Cir.1984):

> An age discrimination suit may not be filed in district court unless the plaintiff filed a charge with the EEOC within 180 days after the alleged discriminatory act occurred. 29 U.S.C. § 626(d)(1). Although the 180–day limit is not jurisdictional in nature and, like a statute of limitations, may be tolled for equitable reasons, *Kephart v. Institute of Gas Technology*, 581 F.2d 1287 (7th Cir.1978), failure to file a timely charge bars an action unless the plaintiff satisfies the court that the filing deadline was tolled on equitable grounds.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir.1990), provides a thorough discussion of tolling doctrines applicable to the ADEA. As our discussion in *Cada* makes clear, Aungst is really making two distinct claims here. First, his contention that he was not aware of the new hires until December of 1986 is an equitable tolling claim, while his argument that Westinghouse induced him to not file a charge by trying to help him find another job is an equitable estoppel, or fraudulent conceal-

ment claim. *Cada*, 920 F.2d at 450–52. Neither equitable approach applies here.

Equitable tolling principles are based on the discovery rule, so that "the filing deadline with the EEOC is tolled until the time when 'facts that would support a charge of discrimination ... were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.'" *Vaught*, 745 F.2d at 410–11, quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir.1975). Aungst filed his claim on November 13, 1986; therefore, if he knew or should have known prior to 180 days previously, or approximately May 17, 1986, of facts giving rise to the claim of discrimination, his claim is time-barred.

Aungst attended regular weekly lunch meetings with retired and current Westinghouse engineers following his discharge in 1983. Aungst testified that at these meetings there was general discussion of employment changes, that "they're interviewing, or they've hired, or something like that," but nothing specific. Aungst also received memoranda relating to staffing in the engineering department, including an internal Westinghouse document dated March 29, 1985 which listed two of the newly hired engineers. Aungst kept this document in his possession, and produced it during discovery. A reasonable person, given the information available to Aungst as of the middle of 1985, "should have known facts that would support a charge of [age] discrimination." *Stark v. Dynascan Corp.*, 902 F.2d 549, 551 (7th Cir.1990) (citation omitted). Not that these facts necessarily would support such a charge, but they were the facts Aungst claimed he discovered more than a year later, and they are the basis of his claim.

■ Equitable estoppel, or fraudulent concealment, applies when an employer "takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Cada*, 920 F.2d at 450–51 (citations omitted). Equitable estoppel is available only under limited circumstances:

**1226**

Among other factors, the granting of equitable estoppel should be premised upon (1) "a showing of the plaintiff's actual and reasonable reliance on the defendant's conduct or representations" and (2) "evidence of improper purpose on the part of the defendant and the defendant's actual or constructive knowledge of the deceptive nature of its conduct." *Mull v. Arco Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir.1986), quoting *Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir.1981).

While it is questionable whether Aungst's reliance on Westinghouse's promise to consider him for future openings was "actual and reasonable," Aungst failed to support his claim that Westinghouse sought actively to deceive him into delaying the filing of his charge with the EEOC. All Westinghouse did was send Joe Kennedy from headquarters to speak to a group of RIF'd employees, one of whom was Aungst, to tell them about the Westinghouse placement service. Westinghouse followed through by putting Aungst's resume in the placement booklet, where it remained for nine months. Kennedy did not guarantee Aungst or anyone else a job, nor did Aungst ever officially reapply in the engineering department at Westinghouse.

Neither equitable tolling nor equitable estoppel principles apply here, so the district court correctly granted summary judgment for Westinghouse on Aungst's failure to rehire claims because Aungst failed to file a charge with the EEOC within 180 days of the alleged discriminatory act.

### III.

The ADEA is about one thing—discrimination on the basis of age. It is not about good employees, it is not about wise employment decisions, it is not about 35 years of loyalty to one company. Robert Aungst served Westinghouse as a competent Autotrol engineer for three-and-a-half decades. Nevertheless, in the reasonable judgment of the person charged with enforcing a 10 percent reduction in force, he was the most expendable engineer in the department.

While that is unfortunate for Mr. Aungst, it has nothing to do with age discrimination.

The decision of the district court to grant judgment notwithstanding the verdict to Westinghouse is

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

In setting aside a jury verdict the evidence must be viewed in the light most favorable to the party prevailing before the jury. *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 90 (7th Cir.1986). It seems to me the majority opinion places great weight on the testimony of Frank Frederick, who apparently selected Aungst for elimination, and no weight at all on the testimony of Aungst, which is characterized as "self-serving." The jury may well have exactly reversed the order of reliance and hence reached a different conclusion. *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1162 (7th Cir.1987) ("nor can we disregard the verdict merely because almost all of the evidence favorable to Isaksen came from his own mouth"), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988). It also may have believed, consistent with the district court's instructions, that the decision regarding Aungst's termination was influenced by executives outside the capacitor department: thus the jury may have deemed critical the EEO officer's confession to feeling a "moral obligation" to the company's younger employees, or the fact that out of the seven engineers terminated in the Bloomington plant's RIF, six were within ADEA's protection.

The heavy reliance placed on "versatility" by Westinghouse's argument and by the majority here seems to me misplaced. "Versatile" may be virtually a synonym for "young." It is not infrequently the case that long-term employees tend to become specialized, doing primarily the things that they do best and doing them with the encouragement of their employer. Indeed in this case Aungst worked in capacitor unit design (the discipline one of his younger successors was learning) for fourteen years before the company began limiting his assignments to autotrol design. New

employees, on the other hand, have been exposed to many facets of the work. They may be uniformly capable of undertaking a wide array of tasks—all perhaps with an equal degree of inexperience. Aungst received substantial increases in pay and excellent ratings on his work—right up to the time he was let go. Pl.Exs. P, S; Order on Summary Judgment at 8 (June 6, 1989). "Versatility" apparently became an issue only when the RIF arrived or perhaps when litigation threatened. Admittedly, the requirement of willfulness makes this a very close case,[1] but I would let the jury verdict stand.

Nor am I persuaded that the late-filing of the EEOC charge clearly bars the refusal to rehire claim. The principal basis for imputing knowledge of new hires to Aungst is a memorandum containing the names of two recently hired engineers. These are not identified on the document as recent hires, Aungst Dep. Ex. 15, and I think we are placing a heavy burden on Aungst to fit the pieces of the jigsaw puzzle together and "know" about developments of which there is no clear evidence he was informed.

I therefore respectfully dissent.

---

1. I find telling, however, the trial judge's first opinion—issued in denying the defendant's motion for summary judgment on the discrimination count—that Westinghouse's repeated offers of early retirement to Aungst (beginning before the company hired the two younger, inexperienced engineers) were probative of willfulness. Order on Summary Judgment at 8 (June 6, 1989).