Stanley W. **NOCHOWITZ**, Plaintiff,

v.

**ERNST & YOUNG**, Defendant.

No. 92 C 5468.

United States District Court, N.D. Illinois, Eastern Division.

June 20, 1994.

---

Michael T. Hannafan, William E. Blais, Chicago, IL, for plaintiff.

Steven R. Smith, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Stanley Nochowitz ("Nochowitz"), who was 48 years old when he was fired by Ernst & Young on December 31, 1991,[1] brought this action against his former employer alleging discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Because Ernst & Young claims that Nochowitz' termination was purely a consequence of firm-wide downsizing [2] and had nothing to do with his age, it has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Ernst & Young's motion is granted and this action is dismissed.

### Background

Ernst & Young is a partnership comprising public accountants. It was formed in October 1990 when Ernst & Whinney combined with Arthur Young & Company, the firm for which Nochowitz had worked since March 1988. From the time of the merger until he was fired, Nochowitz served as an Ernst & Young senior manager, a position that involved him in retail management consulting engagements on which he was expected to serve clients by sharing his acquired knowledge and experience in the retail industry.

Although Nochowitz also worked on other assignments, about two-thirds of his 3¾ year tenure was spent on an assignment related to Walgreen Company.[3] By all accounts that major project ran less than smoothly, and Nochowitz was eventually removed from his position as business function leader. Nochowitz was told at the time by Ernst & Young partner Mike Suthard ("Suthard") that he was being replaced because Suthard felt that it was all Nochowitz' fault that the project had run seriously over budget (Nochowitz Dep. 61).

Either shortly before or shortly after the Walgreen shakeup, Nochowitz received his one and only performance review from Ernst & Young (D. 12(m) Ex. E [4]). That May 15,

---

1. In August 1992 Nochowitz' Complaint ¶ 3 correctly gave his then age as 49. Yet when over a year later D. 12(m) ¶ 1 (see n. 4) incorrectly listed his age as still being 49, Nochowitz admitted that assertion. Indeed, his own P. 12(n)(2) ¶ 1 (filed in February 1994) still showed him as 49, even though Ernst & Young's company records reveal his birth year to be 1943 (P.Ex. R). If those filings somehow reflect any reluctance on Nochowitz' part to acknowledge reaching the half-century mark (rather than just constituting his lawyer's mistakes), he should be mindful of the message conveyed by a congratulatory note that this Court, on arriving at that birthday, received from a golfer friend (who is several years older than this Court):

   You're just starting the back nine.

2. This court pleads guilty to the use of a current euphemism that tends to gloss over the unpleasant human costs involved in the mass firings that are all too common in today's business world. But it must be remembered that lawsuits such as this one are statutorily prescribed correctives for firings caused by prohibited discriminatory motives—they are not intended as a judicial response to other societal problems.

3. Before the Walgreen matter Nochowitz worked briefly on a consulting job referred to as the Kimberly–Clark engagement. After the Walgreen stint Nochowitz handled various small matters and an engagement for Montgomery Ward.

4. This District Court's General Rule ("GR") 12(m) facilitates the resolution of Rule 56 motions by requiring a movant to submit statements of assertedly uncontested facts, with citations to

1990 four-page evaluation, filled out by Suthard, is broken down into eight "major performance areas" categories (followed by eight more short "action plans"). In each category Nochowitz was rated on a scale of 1 to 5, with 1 denoting "Marginal" (meaning "significantly below") and with 3 ("Good") and 4 ("Very Good") respectively meaning "consistently at" and "well above" the yardstick described as "the norm compared to individuals with similar experience at this position level." Three of Nochowitz' scores (categories including "Business Development" and "Application of Knowledge") were 4, four (including "Problem–Solving and Decision–Making" and "Quality Service/Client Satisfaction") were 3, and one ("Engagement Management/Economics") was a 1. Suthard's review cited numerous examples both of Nochowitz' strengths and of his weaknesses, ultimately assigning a "Good" ("consistently at the norm") evaluation to his overall performance. Nochowitz admits that after they had discussed the evaluation he asked Suthard whether the latter wanted Nochowitz to resign, to which Suthard responded he did not.[5]

At some point in July 1991 Ernst & Young reconfigured the organizational structure of its Great Lakes Management Consulting Group ("Great Lakes") practice by dividing what had previously been a number of industry-specific subgroups (such as health care, manufacturing, insurance, financial services, and retail) into two primary practice areas known as the Information Technology ("IT") Group and the Performance Improvement ("PI") Group. Nochowitz, who had formerly worked for the retail industry group in Chicago, joined the PI Group as one of its seven senior managers, six of whom (including Nochowitz) were based in Chicago (D. 12(m) Ex.

H (1991 GLMC Retail Strategic Plan) at 8). Of those senior managers, only Nochowitz and Charles Harrison ("Harrison") had previously practiced their trade in the retail consulting group.[6] Harrison is a year older than Nochowitz.

At roughly the same time that the reorganization was implemented, the Great Lakes managing directors held a meeting to review the unsatisfactory financial position of their consulting practice. Losses for the previous fiscal year had exceeded $7 million, and the higher-ups discussed how to turn that dismal picture around. Group Managing Director (and Ernst & Young partner) Robert McIlhattan ("McIlhattan") put the task in stark terms (Aff. ¶ 2):

> We were informed by the National office that we must generate a profit during the first quarter of the fiscal year of 1992, and if we were unable to do that it would force the National office to make draconian decisions regarding the practice.

At least part of the problem stemmed from overstaffed management ranks (*id.*): For every partner in the Great Lakes practice there were nearly three senior managers, a ratio twice the recommended firm-wide 1:1.5 figure (*id.* ¶ 8). In the period that followed, Ernst & Young reduced the number of Great Lakes partners from 20 to 16 and the number of senior managers from 55 to 43 (*id.*).

To assist him in determining who was to be let go in the PI Group, based on an assessment of the relative skills of the various managers and senior managers, McIlhattan conferred with Ernst & Young partners with prior experience working in the group. After consultations with one of his partners, Jim Cross ("Cross"), McIlhattan made the decision that there was not enough work

---

the record in support of each. In turn GR 12(n) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Thus the parties' GR 12 statements are respectively cited "D. 12(m) ¶ —," "P. 12(n)(1) ¶ —" and "P. 12(n)(2) ¶ —."

5. Nochowitz Dep. 71–72, 74 (at 71–72: "I was told a number of times that I probably knew more about logistics than anybody else in the firm, and that overall, no, he did not want me to

resign, that he felt I had a real future in the consulting business").

6. Whether or not the skills acquired by the senior managers in the former industry-specific practice continued to be relevant after the restructuring (as Ernst & Young contends and as Nochowitz denies) is an issue that will be discussed in substantial detail below. That question is of key importance in determining what other Ernst & Young personnel are situated similarly to Nochowitz for ADEA purposes.

(either present or anticipated) to go around in the retail industry area, and Nochowitz was sent packing—or "asked to leave the firm," as D. 12(m) ¶ 16 more delicately puts it (Cross Aff. ¶ 4; McIlhattan Aff. ¶ 3).[7]

Nochowitz, who was told at the time by Cross and McIlhattan that his discharge was due to a reduction in force ("RIF") and a "national directive to downsize the consulting practice" (P. 12(n)(2) ¶¶ 29, 32), then brought this suit alleging that Ernst & Young had discriminated against him on the basis of his age in violation of ADEA. That has led in turn to the current Ernst & Young motion for summary judgment.

### Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to non-movant Nochowitz (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not foreclose the potential for summary judgment in such cases (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). Moreover, "a plaintiff facing the prospect of summary adjudication cannot 'sit back and simply poke holes in the moving party's summary judgment motion' " (*Young In Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993)).

### Burdens of Production and Persuasion

■ By definition an ADEA plaintiff's success hinges on his ability to prove that he or she was fired because of age—that the employer's age-discriminatory animus was a "but for" cause of the employee's termination (*Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994)). Because he has no direct evidence that he was discharged for that prohibited reason, Nochowitz must perforce rely on indirect proof. And in a situation such as this one, the analysis of that proof is best approached through the methodology prescribed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).[8] Under that methodology Nochowitz must first establish a prima facie case, at which point the burden would shift to Ernst & Young to articulate a legitimate, non-discriminatory explanation for Nochowitz' termination.[9] If Ernst & Young could do that (as every employer invariably manages to do), Nochowitz could prevail only

---

7. Nochowitz attempts to respond to those statements, submitted pursuant to Ernst & Young's evidence-supported D. 12(m) ¶¶ 14–18, with flat unsubstantiated denials (e.g., P. 12(n)(1) ¶¶ 13, 16), coupled with his repeated reliance on the empty reply that he "is without sufficient knowledge or information to either admit or deny [Ernst & Young's] allegations" (e.g., P. 12(n)(1) ¶¶ 14–16) and citations to the Complaint (e.g., P. 12(n)(1) ¶ 16). That evinces a total misapprehension (1) of basic Rule 56 principles, (2) of the purpose of GR 12 in terms of fleshing out disputed issues of material facts and (3) of the fundamental difference between a GR 12(n) statement and an answer to a complaint. Such responses simply do not suffice to rebut Ernst & Young's affidavit-backed contentions (*Aircraft Gear Corp.*

v. *Kaman Aerospace Corp.*, 856 F.Supp. 446, 448–49 & n. 1 (N.D.Ill.1994)).

8. Though those cases arose in the Title VII context, their reasoning can be freely "transposed to the age discrimination setting" (*Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (en banc)).

9. That shifting burden relates only to the production of evidence, for except in the "mixed motives" situation dealt with in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) the ultimate burden of persuading the trier of fact that unlawful discrimination has been at work remains at all times with the employee (*St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)).

by demonstrating[10] that the proffered reason was merely pretextual.

If it is plain that an employee cannot demonstrate the pretextual nature of the employer's asserted reason for letting him go, there is really no point in going through the four-point analysis of the prima facie case (as *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990) teaches). In this instance Ernst & Young has followed its proof of its own bona fides (its lack of pretext) with a demonstration of Nochowitz' inability to establish the considerably easier elements of a prima facie case—but the issues are so intertwined that (as was done in *Holmberg*) this opinion will eschew the prima facie analysis and go directly to the question of pretext.

### Pretext Vel Non

■ Nochowitz can demonstrate pretext either (1) by showing that Ernst & Young was more likely motivated by an age-discriminatory reason or (2) by showing that Ernst & Young's proffered reason is unworthy of credence (*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991); *Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 586, 588 (7th Cir.1992)).[11] Here Nochowitz essays the second approach, as to which *Anderson*, 13 F.3d at 1124 has said, reflecting in part the same point made in n. 10 of this opinion:

However, for summary judgment purposes, the non-moving party, in this case the plaintiff, has a lesser burden. He must only "produce evidence from which a rational fact-finder could infer that the company lied" about its proffered reasons for his dismissal. *Shager* [*v. Upjohn Co.*,] 913 F.2d [398,] 401 [ (7th Cir.1990) ]. As we said in *Shager*,

\*     \*     \*     \*     \*     \*

If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn. This is the common sense behind *McDonnell Douglas....* The point is only that if the inference of improper motive *can* be drawn, there must be a trial.

*Id.* (emphasis in original).

In rebutting Ernst & Young's proffered explanation, Nochowitz need not also come forward with actual affirmative evidence that anti-age animus entered into the calculus (*Oxman v. WLS–TV*, 12 F.3d 652, 657 (7th Cir.1993) ("plaintiffs in reduction-in-force cases bear no greater burden of proof than other ADEA plaintiffs")).[12]

### Hocus "Focus"?

At the outset this opinion must define the relevant employment universe for considering Nochowitz' ADEA claim. Nochowitz ar-

---

**10.** Although the case law (including *McDonnell Douglas* and *Burdine*) speaks in terms of what the employee must "demonstrate" or "prove"— an accurate description of the burden at trial—in the Rule 56 context the employee has the lesser burden of establishing the existence of a genuine issue of material fact (with all reasonable inferences from the evidence drawn in his or her favor)—see, e.g., *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994). Nonetheless, it is far less awkward to use the conventional locution of "proof" than to employ a constant repetition of that lesser burden, and this opinion will do so. But that expedient usage should not be misunderstood: This Court has in fact consistently viewed Nochowitz' case from the perspective of the more-easily-met Rule 56 standard—he has simply failed to meet it.

**11.** *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736–37 (7th Cir.1994) has sought to dispel some common misunderstandings of the distinction between direct and indirect methods of proof in the

employment discrimination context. *Troupe, id.* at 736 points out that an employer's acknowledgment of discriminatory intent "may be the only truly direct evidence of intent that will ever be available," then stresses that several varieties of circumstantial evidence can be just as effective in staving off summary judgment.

**12.** *Oxman, id.* recognized that *Aungst v. Westinghouse Electric Corp.*, 937 F.2d 1216, 1220–21 (7th Cir.1991) could be construed as implying the need for such an additional showing. But *Oxman* rejected that position, stating (*id.*):

The additional burden *Aungst* imposes on reduction-in-force plaintiffs undermines a central purpose of the *McDonnell Douglas* approach—"to relieve plaintiff of the burden of having to uncover what is difficult to uncover—evidence of discriminatory intent."

Accord, *Anderson*, 13 F.3d at 1122–24, analyzing the same question in terms of a "pretext-only" versus a "pretext-plus" approach.

gues that Ernst & Young's emphasis on "industry focus" is bogus—that his treatment by Ernst & Young should be contrasted with that accorded to all of the other senior managers in the PI Group (or at least those based in Chicago), one of whom (at least) was younger and arguably less productive.[13] Ernst & Young disagrees. It insists that its consideration of the declining demand for its services in the retail industry was entirely legitimate, so that only Harrison is relevant for purposes of comparison with Nochowitz. Nochowitz' entire argument that Ernst & Young's stated economic RIF explanation was a lie hangs in the balance—after all, if *all* of the senior managers possessed fungible skills Ernst & Young could not justify terminating Nochowitz just because he did not stack up against Harrison. But if the comparative circle is properly drawn around Nochowitz and Harrison alone, Ernst & Young's decision was purely a matter of business judgment over which this Court must not exercise a veto.

As Nochowitz' Mem. 10–11 would have it, the senior managers' preexisting individual specializations of skills, knowledge and experience no longer had any meaning after Ernst & Young's internal restructuring. But this Court's review of the evidence demonstrates conclusively that such an oversimplistic position is totally at odds with the realities.

At the very same time in mid–1991 that it made the organizational division of its consulting practice into the PI and IT Groups, Ernst & Young continued to emphasize that industry specialization remained one of Great Lakes' critical strengths. Here is what it said in the very plan document that ushered in the new system (D.Supp. Ex. A at 3, a June 24, 1991 letter to all of its management consultants explaining the changes to become effective July 1, 1991):

> Industry specialization is a firmwide strategy and a key factor in winning new clients and effectively serving existing clients. Our industry specialization provides a significant advantage in the marketplace. Our primary industry targets are health care, manufacturing/high tech, financial services industries, and insurance.[14]

And that contemporaneous characterization is echoed in other uncontroverted evidence tendered to this Court, such as Cross Dep. 28:

> And your specialization evolves as you come up. It's almost like declaring a major in college. What happens is—it's real similar to it.
>
> As they get more experienced and we find out where they have a natural nitch [sic] and where they do things well and what they have a desire to work in, then that's the way we try to drive it up.

Suthard Dep. 182 verified that same understanding:

> In other words, as manager, you're typically sort of considered in a pool. And in some respects, you certainly start—you start to specialize generally in some area, but you may be able to do things in certain industries. At the time you become a senior manager, generally you've spent a year or two starting specializing. And once you become a senior manager, you're pretty much in a given area.

Indeed, Nochowitz himself has essentially corroborated Ernst & Young's position that senior managers continued to fall within particular practice subgroups (Dep. 118–19):

---

13. Nochowitz really does not do the necessary job even in that respect, for instead of giving comparative information about the various senior managers whom he seeks to label as making up the relevant pool he concentrates only on a single employee, William Shulby, who is discussed below. Despite that delinquency, this opinion has considered the Ernst & Young records provided in P.Ex. R and has, at least arguendo, assumed that the nonfiring of other younger senior managers (if relevant) could create the inference that Nochowitz' firing was age-motivated.

14. [Footnote by this Court] It is worth noting that the retail industry was omitted from that "primary target" listing and was included only in an ensuing list of industries expected to be targeted "[i]n selected geographic areas"—a difference in emphasis that tends to corroborate Ernst & Young's decision, reached less than six months later, that it could not continue to carry two senior managers whose area of specialization had been concentrated in that retail field.

Q: Was there a reorganization in the Management Consulting Group subsequent to February 1991?

A: Yes.

Q: And as a result the industry practice groups were disbanded, if I might use that phrase?

A. All I can tell you—I don't know if they were or not. I can say to you that there were new titles put on to practice areas.

Q: What was your understanding of the restructuring?

A: I was placed in a group called Performance Improvement. There were, as I understand it, sub-groups underneath that.

\* \* \* \* \* \*

Q: You say you believe there were subgroups in the Performance Improvement practice.

A: I believe that is true.

And even if only unconsciously—advanced in the course of his effort to attack Ernst & Young on pretext grounds—Nochowitz has reconfirmed that the senior managers continued to be viewed by Ernst & Young, and assigned to projects, along industry lines even after the reorganization. Here is an excerpt from his Aff. ¶ 5, an affidavit that accompanied his memorandum in opposition to the current Rule 56 motion: [15]

I dispute defendant's contention that the retail/consumer industry practice of the PI Group was the only specialty for which I was qualified.... [M]y managerial skills and breadth of experience qualified me to work as a Senior Manager in any subgroup within the PI Group. My specialized skills and experience would have enabled me to flourish in either the PI or IT groups regarding retail distribution or manufacturing industries.[16]

And to the same effect, Nochowitz makes the same tacit admission in his P. 12(n)(2) ¶ 38 (emphasizing that a new senior manager was "assigned to the consumer products/retail sales team some time after June 12, 1992").

In sum, while Nochowitz Mem. 9–10 criticizes Ernst & Young's "attempt[ ] to impose a tyranny of labels" (*id.* at 9), the uncontroverted evidence attaches that attempt to Nochowitz instead. It is Nochowitz who improperly seeks to convert the PI and IT Group labels, adopted not long before his firing, into a categorization that compelled Ernst & Young to ignore the actual substance of the responsibilities of those who then operated under those new titles. Against all the evidence, Nochowitz is flat-out wrong in attempting to persuade this Court that retail specialization ceased to have meaning simply because Ernst & Young established a new grouping of its consulting operations in terms of the nature of the services rendered. "Tyranny of labels" is indeed a useful concept—but it is one that dooms Nochowitz' position, not Ernst & Young's.[17]

---

15. Ernst & Young's R.Mem. 4 objects to another facet of that affidavit as an impermissible contradiction of Nochowitz' earlier deposition testimony (citing *Lovejoy Elec., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir.1989)). Whether or not that criticism is sound (the objected-to Aff. ¶ 6 is simply a conclusory statement as to Nochowitz' beliefs, which carry no evidentiary weight anyway), it is appropriate to consider his admission inherent in Aff. ¶ 5.

16. [Footnote by this Court] Nochowitz is simply wrong in contending that Ernst & Young was obliged to place him in another department to avoid firing him (and hence to avoid an ADEA claim). Thus *McDonald v. Krajewski*, 874 F.2d 454, 455 (7th Cir.1989) (citations omitted) has said in a RIF situation:

It is a common observation in employment discrimination cases that when the employer legitimately abolishes a position, its occupant must compete against others for any remaining employment. An employer need not accommodate the desire of its employee to stay on in another post or grant a preference in consideration. The decision is functionally a new hire. Moreover, Nochowitz cannot avert summary judgment by his self-evaluative statement of his own qualifications for such alternative employment—see this Court's opinion in *Sprague v. Navistar Int'l Transp. Corp.*, 838 F.Supp. 1268, 1278–79 (N.D.Ill.1993) (plaintiff's " 'self-interested assertions concerning [his] abilities are not in themselves sufficient to raise a genuine issue of material fact' as to whether he was qualified to fill any of those [other] positions").

17. Nor does Nochowitz escape that conclusion by his Mem. 11–12 discussion of Ernst & Young's " 'matrix' management style, in which senior managers and other employees from either group report to partners in either group, and persons from one group will often cross over to

At the first step, then, in making its RIF-based decision Ernst & Young was unquestionably entitled to compare Nochowitz to the other senior manager or managers specializing in retail. That naturally leads to an inquiry as to exactly who is covered by that description. Both sides agree that Nochowitz and Harrison belong in that category, but Nochowitz argues that senior manager William Shulby ("Shulby")—who was age 37 when he was made senior manager in the spring of 1991, the year in which Nochowitz was later fired—should be considered too.

In contending that Shulby also serves as an appropriate standard for comparison as a retail specialist, Nochowitz points to Cross Dep. 23–24, which identifies Shulby as a senior manager on "the sales team," and to Shulby's own statement (Dep. 4–7) that he has been assigned to the sales team "in the consumer products and retail area." But once again the uncontradicted evidence shows Nochowitz to be emphasizing the "tyranny of labels" rather than the realities that must control—this time he chooses to ignore the actual substance of Shulby's specialization rather than the generic "retail" label that forms a portion of his team's title.

Shulby was *not* hired for any degree of know-how in the retail field at all. Instead Ernst & Young brought him aboard in April 1991 to get the benefit of his expertise in customer management (direct and database marketing in particular), a field in which Ernst & Young aspired to develop a new practice area serving clients across several other industries (Shulby Dep. 9, 25). Even though his expertise was not limited to any particular industry, Shulby of course had to be assigned to a supervisor, and Ernst & Young chose James Dull (who specializes in manufacturing and consumer products).

But as to the real question—the kind of work that Shulby performs—he testified that the majority of his hours were concentrated "in areas such as financial services, banking,

telecommunications, et cetera" (Dep. 9). Asked whether his experiences with Ernst & Young had also included retail, Shulby responded that he could recall *no* specific engagements in that area (Dep. 10). Moreover, he explained that even if he were to be designated as part of a retail sales team, that would really say nothing about his actual work specialization (*id.*):

> Q: So even though you are assigned to a retail sales team, for example, you might work for a manufacturing or insurance client; is that correct?
>
> Shulby: That is correct. It is because of my skill set.

It is unsurprising, then, that the "retail" part of the categorization under which Shulby functions has no significance whatever in the present context. What happened was that when Ernst & Young's retail consulting activities had become too small to be sustained alone (McIlhattan Dep. 186), that category was packaged with the consumer products industry as an internal matter "so that we would have critical mass" (*id.*)—but without in any way changing the nature of Shulby's work.

In summary, it is uncontroverted that Shulby's unique "skill set" is no way consonant with Nochowitz' own (or, by the same token, with Harrison's). Hence Ernst & Young's comparison of Nochowitz to Harrison as the only other senior manager whose talents were primarily concentrated in the shrinking retail area was wholly appropriate, regardless of the label that has been sought to be assigned to Shulby (a somewhat misleading label at that, because it relates to the team of which he is a part and not to his own skills and activity).

That makes it unnecessary to go on to deal with the inadequacy of Nochowitz' arguments that he was assertedly better qualified than Shulby, so that Ernst & Young's assigned reason for firing Nochowitz had to be pretex-

work on the projects of the other group" (*id.* at 11). Even if that is so, such "fluidity" (*id.*) does not at all negate Ernst & Young's right to consider individual specialized skills in reaching its RIF decisions. In fact, that very "fluidity" really confirms that each individual senior manager continued to bring his or her own specialized

talents to whatever sort of engagement happened to arise (see Nochowitz Mem. 2, admitting that "[t]he reorganization did not change personnel or supervisory channels procedures") and P. 12(n)(2) ¶ 22 (even after the reorganization "[t]here was no change in the senior managers' duties, or the nature of their work")).

tual. Even though Ernst & Young has gone on at some length (and persuasively) to show that the single factor to which Nochowitz points—Nochowitz' much higher "utilization rate" (billable hours as a percentage of total time spent)—does not give rise to a reasonable inference of pretext, that effort is a needless confrontation of a red herring. Where all of the evidence is that Ernst & Young did not—and was not obligated to—include Shulby in its decision as to how to implement the needed cutback in its retail-specialized senior managers, there is simply no need to pursue the matter further.

### Harrison Comparison

McIlhattan has said without contradiction that the economic downsizing brought on by fiscal imperatives at Ernst & Young gave rise to some unavoidably difficult decisions about staffing (Aff. ¶ 9; McIlhattan Dep. 51 ("simply stated we had too many consultants within our organization that did—that weren't driving enough revenue, profitable revenue for us to be viable"). Great Lakes' Managing Director Jim DiStasio requested, and McIlhattan compiled, a ranking of all senior managers in the PI Group (McIlhattan Aff. ¶ 3). As a necessary consequence of that ranking "a number of senior managers were identified who were at the bottom of the group" (*id.*). McIlhattan continued (*id.*):

> With respect to those individuals who had previously come from an industry practice prior to the reorganization, I spoke with partners in the former industry groups to obtain their input regarding senior managers in their group. As it related to those individuals who had been retail industry group, who were now in the PI group, there were only two senior managers in this category. They were Mr. Stanley Nochowitz and Mr. Charles Harrison.[18]

At the same time Cross told McIlhattan that he "did not believe the group could keep two senior manager level individuals busy" in

the retail field (Cross Aff. ¶ 4; McIlhattan Aff. ¶ 3).[19] McIlhattan then had to make a choice, and he decided that Harrison (who it will be recalled is a year older than Nochowitz) was more likely to succeed as a Great Lakes consultant (McIlhattan Aff. ¶ 9).

That puts this case into the familiar construct that negates any judicial second-guessing of an employer's business judgments. Ernst & Young says some good things and some bad things about Nochowitz' performance. Nochowitz himself says some bad things as well as some good things about his own work. Most importantly, no evidence even hints that Ernst & Young's one-to-one preference of Harrison over Nochowitz was anything other than a merit-based choice—and what is truly dispositive for this case is that it was surely not age-discriminatory.

Under the circumstances, it is not for this Court to override McIlhattan's decision to terminate Nochowitz rather than Harrison, the only other senior manager specializing in retail (as *Williams v. Williams Elec., Inc.*, 856 F.2d 920, 924 (7th Cir.1988) put it, "We determine only whether [the employer's] lay-off decision actually involved an attempt to select employees on the basis of performance-related considerations and was genuinely and honestly made"). All that really matters for ADEA purposes is that Ernst & Young was not out of line for the statutorily prohibited reason, for this Court "does not sit as a super-personnel department that re-examines an entity's business decisions" (*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)). Even had Ernst & Young's decision been mistaken (and there is nothing to indicate that it was), this Court's inquiry would have been limited to "whether the employer gave an honest explanation of its behavior" (*Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988), quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.1987)).[20]

18. [Footnote by this Court] Nochowitz Mem. 11–12 also quotes the identical language to illustrate what he evidently considers an inappropriate application of no-longer-suitable labels—an argument already rejected in this opinion.

19. Nochowitz himself provided support for that evaluation when he testified (Dep. 96) that he

took a four-week vacation just before his termination because he "had no other engagement on the horizon at that stage of the game."

20. It is also worth mentioning that Nochowitz has failed to offer any evidence or argument focusing on the Ernst & Young RIF, "the specific reason[] advanced by the defendant" for his

**466**

Nochowitz makes one last argument, but it does not call for any other result. At some time after Nochowitz received his pink slip, Ernst & Young partner Paul Conti ("Conti") asked Great Lakes' insurance coordinator Kristeen Schwab ("Schwab") to print out several lists from the firm data base. Schwab, whose duties include handling benefits forms and various other paperwork processing assignments, delivered the requested lists to Conti along with this handwritten note on Ernst & Young notepaper (P.Ex. R):

Paul,

It doesn't look good. To date, of the 9 Sr. Mgrs. who were discharged, 6 were over 40. If you add Nochowitz and Howells, both of whom will be leaving in Dec., it will be 8 out of 11—73%. Currently, only 16 out [sic] 49 Sr. Mgrs. are over 40—33%. If you take out Nochowitz & Howells, it's 30%.

Kris

That note simply does not qualify as a smoking gun even in the limited inference-creating sense that would avert summary judgment against Nochowitz. Schwab's unsolicited (Schwab Dep. 55) personal speculations about the numbers reflect her uninformed view that *all* of the senior managers form the relevant base for evaluating Ernst & Young's firing decisions. This opinion has reached the opposite conclusion as to Nochowitz based on the relevant legal principles, and Schwab's lay opinion is inadmissible to alter that conclusion (see Fed.R.Evid. 701).[21]

### Conclusion

Because Nochowitz has failed to present any evidence from which reasonable inferences can be drawn to rebut Ernst & Young's explanation that he was terminated pursuant to an economically necessary RIF, there is no genuine issue of material fact and Ernst & Young is entitled to a judgment as a matter of law. This action is dismissed.

---

termination (*Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir.1994)). That omission is particularly damaging in the RIF context (*Oxman*, 12 F.3d at 658 has said: "As a practical matter, direct evidence of discriminatory intent might be the only evidence that would convince a trier of fact that a corporate reorganization—particularly a large-scale one—was pretextual").

21. Apart from the purely statistical aspects of her note, the only thing that Schwab says there is "It doesn't look good"—plainly a lay opinion, even if it were somehow to be viewed as meeting the non-hearsay standard of Fed.R.Evid. 801(d)(2)(D). And as for the statistical information, it prompts a reference to the saying (usually attributed to Mark Twain, but ascribed by Twain himself to Benjamin Disraeli) that "there are three kinds of lies: lies, damned lies and statistics."