**Betty Jo BERLETT, Plaintiff,**

v.

**CARGILL, INC., Defendants.**

**No. 89 C 3069.**

United States District Court,
N.D. Illinois, E.D.

Dec. 9, 1991.

Nicholas Esposito, Esposito, Heuel & Schrum, Chicago, Ill., for plaintiff.

Larry LaSusa, Dowd & Dowd Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Betty Jo Berlett ("Berlett") has sued Cargill, Inc. ("Cargill"), asserting that she

was denied employment in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. Each of Berlett and Cargill now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons stated in this memorandum opinion and order, Cargill's motion is granted and Berlett's motion is denied.

### Facts

Berlett was born on March 3, 1929 (Berlett Dep. 4). From 1975 to 1984 Berlett worked as a grain merchant[2] for Pillsbury Company ("Pillsbury") at its grain merchandising plant in Roberts, Illinois (*id.* at 5, 8). In September 1984[3] Pillsbury sold the Roberts plant to Cargill, which owned and operated numerous grain merchandising plants in the area, including one in nearby Gibson City, Illinois (*id.* at 5–6, 25).

At the time of the sale Pillsbury employed four office workers (D. 12(m) and P. 12(n) ¶ 12[4]):

1. Andrew Schuler ("Schuler"), a 35-year-old office manager;

2. Berlett, a 55-year old grain merchant;

3. Rosemarie Fairley ("Fairley"), a 43-year-old bookkeeper; and

4. Kathryn Hethke ("Hethke"), a 28-year-old clerk.

Pillsbury also employed several individuals who worked in the physical plant (D. 12(m) and P. 12(n) ¶ 13). There was no requirement in the purchase and sale agreement between Pillsbury and Cargill for the continued employment of Pillsbury's employees (D.Ex. C ¶ 5), and all Pillsbury employees were terminated when the sale of the plant became effective (Berlett Dep. 18).

David Raisbeck ("Raisbeck"), who worked out of Cargill's central office in Minneapolis, was its regional manager for the State of Illinois and was responsible for personnel decisions at the newly-acquired Roberts plant (D. 12(m) and P. 12(n) ¶ 14). Richard Schnittjer ("Schnittjer"), manager of Cargill's Gibson City plant,[5] also participated in the personnel decisions (Raisbeck Dep. 29, 74–75). Schnittjer and Raisbeck discussed both overall staffing needs and individual applicants as part of their decision making process (D. 12(m) and P. 12(n) ¶ 15; Raisbeck Dep. 28–33; Schnittjer Dep. 64–65, 70–72).[6] As part of that process,

---

**1.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant—in this case (1) Cargill as to Berlett's motion and (2) Berlett as to Cargill's motion (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citations omitted). Where as here cross motions are involved, that principle thus demands a dual perspective—one that this Court has sometimes described as Janus-like—that sometimes causes the denial of both motions. This District Court's General Rule ("GR") 12(m) and 12(n) requires factual statements in support of and in response to Rule 56 motions, and both sides have tendered such statements (respectively cited "P. 12(m) ¶ —," "D. 12(n) ¶ —," "D. 12(m) ¶ —," and "P. 12(n) ¶ —,") although Berlett has captioned her response "12(m)(1)," while Cargill has captioned its response "Defendant's Objections to Plaintiff's Statement of Uncontested Facts"). Fortunately those statements reveal no need for concern that the drawing of inferences in opposite directions could make the current exercise a dry run, because the factual differences that Berlett's counsel point to are not

material—that is, outcome-determinative (*Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir. 1986)).

**2.** "Grain merchant" and "grain merchandiser" refer to the same position (Schnittjer Dep. 23; Neighbors Dep. 24–25) and will be used interchangeably throughout this opinion.

**3.** All relevant dates were during the year 1984. This opinion will therefore omit the year designation from now on.

**4.** This form will be used where an assertion in one party's GR 12(m) statement is admitted in the other's GR 12(n) response.

**5.** Before his September transfer to Gibson City, Schnittjer had been manager of Cargill's Clarion, Iowa facility (Schnittjer Dep. 9–12).

**6.** Raisbeck testified that he was ultimately responsible for decisions at the "exempt" level—which included the merchant and manager positions—while Schnittjer made decisions regarding "nonexempt" employees such as bookkeeper and clerk (Raisbeck Dep. 29–33, 53). Although Berlett has admitted that Raisbeck was responsible for decisions about the merchant and manager (P. 12(m) ¶ 39), Schnittjer contradicted Ra-

Schnittjer screened the former Pillsbury employees to determine what they had done while employed by Pillsbury and whether they were qualified for the positions that Cargill intended to fill, although Schnittjer was not at the time of the interviews completely certain which positions would be retained (Schnittjer Dep. 84–86, Raisbeck Dep. 34, 39–40).

After the screening process was completed, Cargill hired Fairley and Hethke to fill the same positions they had filled under Pillsbury, but it did not hire Berlett and Schuler (D. 12(m) and P. 12(n) ¶¶ 20, 21). Cargill transferred Clark Neighbors from its Schneider, Indiana plant to fill the grain merchant position (Raisbeck Dep. 44–45, 55) and relied on Schnittjer to manage the Roberts plant from Gibson City (*id.* at 92–93; Schnittjer Dep. 122). Cargill also hired some of Pillsbury's weighers, graders and other plant workers, but it did not hire two of Pillsbury's plant workers: Dennis Kaeding, who was in his late 30's, and Larry Bleich, who was in his early 40's (D. 12(m) and P. 12(n) ¶ 22).

### Applicable Legal Framework

■ To succeed on her age discrimination claim, Berlett must prove[7] that she would have been hired " 'but for' [her] employer's motive to discriminate against [her] because of [her] age" (*Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332, 335 (7th Cir.) (citation omitted)). There are now two essentially different frameworks through which an employee may prove her claim. One is the mixed-motives analysis announced in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989), appropriate when both legitimate and illegitimate considerations played a role in an adverse employment decision, and the other is the familiar ping-pong approach dictated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–4, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), appropriate when "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision" (*Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1789 (emphasis in original)).[8]

If an employee offers direct evidence of age discrimination, *Price Waterhouse* immediately comes into play—for if the employee can sustain his or her initial burden of proof on that score, the burden of proof shifts to the employer and the employee need not rebut the employer's claim in the first instance. On the other hand, the "entire purpose" of the *McDonnell Douglas/Burdine* framework is "to compensate for the fact that direct evidence of intentional discrimination is hard to come by" (*Price Waterhouse*, 490 U.S. at 271, 109 S.Ct. at 1801 (O'Connor, J., concurring)). Hence it is normally triggered by an employee's lack of direct evidence—and in that event the employee sustains the burden of proof throughout.[9] What that means in the context of summary judgment

---

isbeck's statement, saying that all decisions were made by agreement between himself and Raisbeck (Schnittjer Dep. 72). At an earlier point in his own deposition Raisbeck also stated that both he and Schnittjer participated in the decision not to hire Berlett (Raisbeck Dep. 28).

**7.** Although the text both here and later speaks of what Berlett must "show" or "prove," any such location must be understood in the Rule 56 context as imposing on her the lesser burden of demonstrating a genuine issue of material fact in order to survive a motion for summary judgment by Cargill.

**8.** Although *Price Waterhouse, McDonnell Douglas* and *Burdine* are all Title VII cases, their approaches have been held applicable to ADEA

cases as well (*Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 657–58 (7th Cir.1991) (en banc); see also *Karazanos*, 948 F.2d at 335–36). In addition, although Congress has recently acted to change the impact of *Price Waterhouse*, it will be assumed for present purposes that the legislation does not affect the text analysis. ADEA has not been expressly amended, and *Visser* cites to the *Price Waterhouse* analysis, which this opinion will assume to be untouched by later legislative changes to Title VII (a pro-Berlett assumption).

**9.** Burden of proof (the burden of persuasion) should not be confused with the burden of production (often termed the "burden of going forward"), a burden that does shift and re-shift in the *McDonnell Douglas/Burdine* analysis.

motions in a case such as this one, where the employee proffers any direct evidence of age discrimination, is that this Court should first determine whether there is any genuine issue of material fact under the mixed-motives analysis of *Price Waterhouse*.

*Price Waterhouse Direct Method*

■ *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1794 (adapted to the ADEA context) describes the route to be traveled in an employment discrimination case when the employee offers direct evidence of discrimination:

> [W]e hold that when a plaintiff in [an ADEA] case proved that her [age] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [age] into account.

In other words, where it appears that the employer had mixed motives—one legitimate and one illegitimate—the ultimate burden shifts to the employer to prove that its decision would have been the same without the illegitimate motive.

As for the employee's initial burden in a mixed-motives case, *Price Waterhouse, id.* at 250, 109 S.Ct. at 1790 (again adapted to speak in ADEA terms) elaborates:

> In saying that [age] played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was [over age 40].

But it must be remembered that the just-quoted opinion was that of a four-Justice plurality, so that the majority ruling depended upon the concurrence of Justice O'Connor or Justice White or both. Hence the term "motivating part" must be read as requiring the unlawful motive to have been a substantial factor—not just a factor—in the adverse decision (*id.* at 265 and 259, 109 S.Ct. at 1798 and 1795). *Visser*, 924 F.2d at 658 restates the *Price Waterhouse* test in this way:

> [O]nce the plaintiff in a civil rights case has shown that a forbidden purpose was a substantial factor in the decision to fire him, the burden shifts to the employer to persuade the court that the plaintiff would have been fired anyway, even if that purpose had not existed.

■ Berlett offers one piece of direct evidence that Cargill impermissibly took her age into account in making its decision not to hire her. During her deposition she summarized that evidence (Berlett Dep. 52):

> In the course of conversation nearing the close of the interview Mr. Schnittjer said, and this is a direct quote, "I know I'm not supposed to ask you this, but how old are you?"
>
> Now, actually, I was smart enough to know I didn't have to answer, but I was so taken aback by the question, and the gentleman had been very cordial during the interview, that I just blurted out 55.

Although Schnittjer admits to having adverted to Berlett's age, he portrays the scene somewhat differently (Schnittjer Dep. 91–92; see also *id.* at 99–102):

> [I]n the very early part of the interview Betty Bertlett [sic] was—seemed to me quite nervous, quite ill-at-ease. ... I quickly read her employment application ... noticed on the bottom of that application that what was very obvious, if I hadn't looked at the application, that we were somewhat in the same age group compared to other personnel; that we have been around probably a long time doing grain elevator work of one kind or another, probably; and I made some statement that we graduated approximately the same era.
>
>     *     *     *     *     *     *
>
> And I said something to the effect that we must be close to the same age; and then I said, "I shouldn't ask you how old you are." And she proceeded to ask that question—answer that question. That wasn't necessarily posed as a question. It was more of a statement.

■ Even accepting Berlett's version of the interview, stray comments or questions regarding a plaintiff's age are not at all sufficient to establish under *Price Waterhouse* that age was a substantial factor in the employer's decision (*McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991); and see n. 22 of this opinion). Berlett must also show that the question was related to Cargill's decision not to hire her (*id.* at 686–87).

In support of her theory that Schnittjer's question was related to Cargill's decision not to hire her, Berlett offers circumstantial evidence.[10] Berlett relates that several days after her interview Schnittjer told her that she would not be hired because Cargill had decided to handle merchandising out of its Gibson City office and would not be hiring a grain merchant for the Roberts office (Berlett Dep. 28–29). She contends that this statement was untruthful, because Neighbors was transferred to Roberts shortly after that to perform the merchandising function (*id.* at 55; Neighbors Dep. 28, 73; Raisbeck Dep. 44–45).[11]

Two issues of material fact are thus unresolved as to Schnittjer's comment: the parties disagree both about the content of the conversation and about whether it influenced Cargill's ultimate decision. But those unresolved issues do not preclude the granting of Cargill's motion for summary judgment. Even if this Court draws the pro-Berlett inference that age did play a "motivating part" in Cargill's decision (however attenuated that inference may be), Berlett still cannot withstand Cargill's motion because there is no genuine issue of material fact to suggest that Cargill would not have made the same decision even if it had not taken Berlett's age into account.

In support of its decision to transfer Neighbors rather than to hire Berlett, Cargill articulates three wholly non-age-related reasons:

1. Cargill was trying to cut costs by consolidating positions and reassigning existing Cargill employees (Raisbeck Aff. ¶ 20).

2. Cargill prefers to fill exempt positions with individuals who have been trained under Cargill's management training program (Raisbeck Aff. ¶ 19), as Neighbors had been (Raisbeck Dep. 135, 141).

3. Cargill has a policy of promoting employees from within whenever possible (D.Ex. E ¶ 3; D.Ex. F at 2–1; D.Ex. G at 2 [12]).

All those themes were sounded throughout the period of Cargill's acquisition of the Roberts plant.

---

**10.** Although Berlett's circumstantial evidence suggesting possible discrimination is more like what generally gives rise to the *McDonnell Douglas/Burdine* rather than the *Price Waterhouse* approach, the rigid distinction is not necessary for purposes of these summary judgment motions. If this Court finds, travelling the *Price Waterhouse* route, that there is no genuine issue of material fact as to whether Cargill would have made the same decision even if it had not taken Berlett's age into account (assuming for the moment that it did so), then there must also be no genuine issue of material fact regarding the lesser *McDonnell Douglas/Burdine* question—whether the non-age-based reason is a pretext.

**11.** It is unclear from the materials submitted to this Court whether Schnittjer's representation to Berlett was based on a misunderstanding or was really untrue. According to the depositions, the term "merchant" had different meanings to different parties (see, e.g., Schnittjer Dep. 22–23, 67, Raisbeck Dep. 53–58 and Neighbors Dep. 10–12). Whereas Berlett under the job title "merchant" had spent her time both buying and

selling grain (Berlett Dep. 8), Neighbors was brought to Roberts only to buy grain (Neighbors Dep. 11–12). In fact he was originally responsible for only half of the buying—that coming from farmers, as opposed to that coming from elevators (*id.* at 28, 32, 83; Raisbeck Dep. 54–58). All the merchandising functions not performed by Neighbors were handled out of the Gibson City office (Neighbors Dep. 46–48). Thus some of the surface discrepancies that plaintiff points out between the testimony of Raisbeck, Schnittjer and Neighbors (P. Reply 1, 5–6) may be due to the fact that they did not share a common referent for the term "merchant" or "merchandiser." It is not necessary for this Court to look deeper into that problem because, as noted in the text, Berlett cannot withstand Cargill's motion even if the possible factual dispute is resolved in her favor.

**12.** Cargill's counsel has failed to number the pages of Exhibit G, so that this Court has had to do so.

In an internal memorandum dated August 23 (predating the September 14 purchase of the Roberts facility by nearly one month), Raisbeck stated his belief that Cargill could reduce the number of employees at Roberts by 50% and his intention to "utilize existing management, merchants and the elevator superintendent at Gibson City to operate and merchandise the grain for Roberts" (D.Ex. A at 3; see also *id.* at 2). Both Schnittjer's and Raisbeck's depositions also reflect that Cargill intended to reorganize the office structure at Roberts to make it more efficient (Schnittjer Dep. 121–22), to reduce the total number of employees at Roberts (*id.* at 66; Raisbeck Dep. 124–25) and to move employees between its own plants as part of that process (Schnittjer Dep. 68). Those depositions also express Cargill's intention to fill the merchant position with someone already employed by Cargill (Raisbeck Dep. 33, 44–45, 52, 62, 125; Schnittjer Dep. 66–68, 132).[13] Thus both Raisbeck and Schnittjer testify that even before Berlett's interview they did not intend to hire someone from outside Cargill to fill the grain merchant position (Raisbeck Dep. 33–34; Schnittjer Dep. 66–67, 88–89). In fact, Raisbeck directly states (Dep. 34) that "[t]here was no position available ... I did not consider Betty for any position."

Berlett attempts to discredit Cargill's non-age-related explanations through two arguments. Neither carries with it any real degree of persuasiveness.

First, Berlett contends that the fact that Schnittjer took an employment application from her (Schnittjer Dep. 80), interviewed her on September 10 (*id.* at 83) and did not tell her until after the interview that her position would not be retained for her (Berlett Dep. 27–29) indicates that Cargill was in fact considering her for that position. Cargill counters that the application and interview did not imply that it was considering Berlett for employment or had a position that she might fill. Instead Raisbeck stated, "[a]s a consideration former [sic] employees, we allowed them to fill out applications and to be screened" (Raisbeck Dep. 85; see also *id.* at 34). Cargill admits that at the time of the interviews Raisbeck and Schnittjer were not absolutely certain which positions they would be retaining, and it explains that one purpose of the screening process was to help make that determination (Schnittjer Dep. 84–86, 117, 120; Raisbeck Dep. 39–40).[14] Thus Schnittjer also interviewed Schuler even though Cargill did not intend to hire him and specifically expected that his position would be filled by Schnittjer (Schnittjer Dep. 66, 117; Raisbeck Dep. 90).

Any such dispute is irrelevant in any event, however. Even if this Court were to credit Berlett's argument that Cargill did consider Berlett for the position and ultimately decided to choose Neighbors,[15] that does not raise a question of material fact about whether it made that choice for an age-based reason.

**13.** There is some inconsistency between Raisbeck's and Schnittjer's testimony as to Cargill's plans for the merchant position. Schnittjer states that the position was to be eliminated completely and that merchandising for Roberts would be done by himself and others at the Gibson City plant (Schnittjer Dep. 89, 122, 132). Raisbeck, however, says that he intended to bring an employee to Roberts to perform the merchandising function (Raisbeck Dep. 33, 44–45). As noted earlier (see n. 11), such apparently conflicting statements are reconcilable because different speakers had different referents for the term "merchant." In any event, any even arguable discrepancy is not relevant to the question of whether or not Cargill intended to hire a *new* employee to fill the merchant position.

**14.** Indeed, Berlett's own account tends to support Cargill's characterization of the interviews as held for information-gathering as well as hiring purposes. Berlett stated that during her interview she and Schnittjer discussed (Berlett Dep. 20):

[g]eneralities relating to the business. He asked and I provided him with information on our facility, on my duties. I gave him a list of my customers, and a general rundown on what I had been doing for the last nine years.

**15.** That arguendo assumption implies nothing about its comparative credibility. Summary judgment motions are not the occasion for resolving issues of credibility (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

Second, Berlett contends that in addition to the grain merchant position she was qualified for and interested in the book-keeper and clerk positions, for which Cargill did hire former Pillsbury employees (P.Mem. 5; P.R.Mem. 5).[16] Berlett's application stated that she was applying for "grain merchandiser/originator or whatever I may qualify for"[17] (P.Ex. A). Although Schnittjer admits that he had Berlett's application at the time of her interview (Schnittjer Dep. 83), he says that he did not realize that Berlett was interested in any position other than merchant (Schnittjer Dep. 87–88).[18] Raisbeck, who says that he never saw Berlett's application, also says that he did not know that Berlett was applying for more than her own position (Raisbeck Dep. 120–21).

Once again any such difference in the parties' positions is irrelevant. Although Berlett's contention would leave unexplained Cargill's choice of Fairley and Hethke over Berlett for the positions of bookkeeper and clerk (a "choice" that Cargill says it never made), any such purported "choices" do not contribute in any way to a finding that Cargill violated ADEA. After all, Cargill hired both Fairley and Hethke to fill the same positions that they had held under Pillsbury after Cargill determined that they had been adequately performing their duties (Raisbeck Aff. ¶¶ 12, 13).[19] As this Court has previously stated in *Zick v. Verson Allsteel Press Co.*, 644 F.Supp. 906, 913 (N.D.Ill.1986), *aff'd*, 819 F.2d 1143 (7th Cir.1987), an employer is not required under ADEA to "fire a younger employee holding any job for which [plaintiff] was qualified. ... [T]he fact an employer fails to find some way of retaining an older employee, even at the expense of firing a younger one, is not evidence of a discriminatory motive."

Nor does Cargill's hiring of Fairley and Hethke, two ex-Pillsbury employees, indicate that Cargill did not in fact adhere to its stated hiring policies (as Berlett argues at P.R.Mem. 2). First, Cargill's preference for transferring already-existing employees is not negated by the fact that it did not do so in every case. Moreover, the position of merchant is a more senior position than either bookkeeper or clerk (Raisbeck Dep. 32–33, 120; Berlett Dep. 57) and is therefore quite clearly a more fertile ground for promotion than either of those positions. Indeed, the preference for employees who had been through Cargill's management training program applied only to the more senior "exempt" positions (Raisbeck Aff. ¶ 19) and *not* to "non-exempt" positions such as bookkeeper or clerk (see n. 6).

In fact, quite contrary to Berlett's proposed reasoning, the only former Pillsbury employee whose employment status was comparable to Berlett's is the 35–year-old Schuler. Like Berlett, Pillsbury's former manager Schuler was in a more senior "exempt" position. Like Berlett, Schuler applied for more than one position (his application indicated he was interested in working as manager or merchandiser, D.Ex. D). And, like Berlett, Schuler was not hired but was replaced by an already-existing Cargill employee (Schnittjer). And of course the fact that Schuler was *not* in the ADEA-protected over–40 age bracket cuts directly against Berlett's contention that what was at work in Cargill's election not to hire her was an age-motivated decision.[20]

Thus there is no genuine issue of material fact as to Cargill's reasons for not hiring

16. Hethke, the bookkeeper, was in fact hired on a part-time basis only, and her position was eliminated after Cargill's first harvest season (Raisbeck Dep. 117).

17. "Originator" is yet another synonym for merchandiser (Raisbeck Dep. 33; Neighbors Dep. 76).

18. Berlett admits that during the interview she did not tell Schnittjer that she was applying for such additional positions, nor did he indicate that she was being considered for them (Berlett Dep. 24).

19. Berlett concedes that she was not more qualified for the positions than either Fairley or Hethke (Berlett Dep. 33–34). It may also be noted that Fairley is also part of the ADEA protected class, though younger than Berlett.

20. This is not to suggest that any statistical significance should be attached to the fact that Cargill hired two Pillsbury office workers (one under 40 and the other over 40) while not hiring the other two (Schuler, who was under 40, and Berlett, who was over 40). That small a universe cannot possibly produce a set of statistically significant comparisons.

Berlett. Berlett has offered no factual evidence contradicting the existence of the policies that Cargill enumerates. Nor do any of her arguments cast doubt on those policies. Thus even indulging every reasonable pro-Berlett inference, Berlett cannot withstand Cargill's motion for summary judgment.

### McDonnell Douglas/Burdine Indirect Method

Under the *McDonnell Douglas/Burdine* framework, an employee must first establish a prima facie case of discrimination by showing (*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824):

(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Once the employee establishes a prima facie case of discrimination, the burden of production shifts to the employer to rebut the presumption of discrimination by articulating "a legitimate, nondiscriminatory reason" for its decision (*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). If the employer meets that burden, then the employee must prove that the proffered reason was a pretext for discrimination (*id.* at 253, 101 S.Ct. at 1093).

But as this Court has previously observed in *Nellis v. Service Web Offset Corp.*, 695 F.Supp. 398, 402 (N.D.Ill.1988), the *McDonnell Douglas/Burdine* matrix can be reduced to a single step when the employer's proffered nondiscriminatory reason for not hiring the employee parallels the second element of the employee's prima facie case (see also *Shager v. Upjohn Co.*, 913 F.2d 398, 400–01 (7th Cir. 1990) and *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990) [21]). Because Cargill's articulated nondiscriminatory reason for not hiring Berlett—that it was not seeking applicants for the position for which she applied—also rebuts the second element of her prima facie case, that principle also holds true in this case. That being so, the only necessary focus in the indirect approach is once again on Cargill's stated non-age-based reason for not hiring Berlett.

There is no need to labor the discussion further—the just-completed analysis has already established as a matter of undisputed fact that (even if this Court indulges the pro-Berlett inference that age was a substantial factor in the equation [22]) Cargill's decision was based on nondiscriminatory reasons. That completes the *McDonnell Douglas/Burdine* analysis as well. By sustaining its greater burden (one of persuasion and not merely production) under the *Price Waterhouse* approach, Cargill has also met the less burdensome *McDonnell Douglas/Burdine* requirements.

### Conclusion

There is no genuine issue of material fact here—more specifically, no material fact supports Berlett's claim that Cargill violated ADEA by failing to hire her. Cargill is entitled to a judgment as a matter of law, and Berlett's cross-motion under Rule 56 is of course denied. This action is dismissed in its entirety.

---

**21.** Because all the cited cases deal with employees who have been fired rather than with applicants who have not been hired, the second prima facie case element in those cases was that the employee was performing according to his employer's legitimate expectations. In the current context, the second element is the original *McDonnell Douglas* element—that the employee applied and was qualified for a job for which the employer was seeking applicants. That distinction, however, does not affect the total analytic comparability of the cases.

**22.** It *is* worth repeating once more that it strains credulity to attach that inference to Schnittjer's single offhand reference to Berlett's age. After all, awareness of someone's being in the protected age category scarcely equates to being motivated by that factor in making an employment decision. Indeed, even on Berlett's account of the conversation Schnittjer *knew* that her age was not a permissible consideration.