**Richard SPRAGUE, Plaintiff,**

**v.**

**NAVISTAR INTERNATIONAL TRANSPORTATION CORP., Defendant.**

**No. 91 C 5194.**

United States District Court, N.D. Illinois, E.D.

Nov. 22, 1993.

Glenn R. Gaffney, Glendale Heights, IL, for plaintiff.

David J. Parsons, Sheila M. Brennan of Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Richard Sprague ("Sprague") has sued Navistar International Transportation Corp. ("Navistar"), claiming it discharged him because of his age (42 at the time of his dismissal) in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Navistar has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons stated in this memo-

---

1. This District Court has supplemented Rule 56 with its own General Rule ("GR") 12 to facilitate the resolution of motions for summary judgment. This opinion will cite to the parties' submissions in this fashion:
   1. Navistar's: "D. 12(m) ¶ —," "D. Ex. —" and "D.R. Ex. —";

randum opinion and order, its motion is granted and this action is dismissed.

### Summary Judgment Standards

█ Rule 56(c) requires that to be "entitled to a judgment as a matter of law," the moving party must establish the lack of any "genuine issue as to any material fact" (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In that respect a "genuine issue" requires that there be sufficient evidence for a jury to return a verdict in favor of the nonmoving party (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), while a "material fact" is one that "might affect the outcome of the suit under the governing law"—here ADEA (*id.* 477 U.S. at 248, 106 S.Ct. at 2510; *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)).

█ In the application of those principles this Court need not draw "every conceivable inference from the record—only those inferences that are reasonable" in favor of nonmovant Sprague (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991)). While the standard for summary judgment is "applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)), that does not render the summary judgment procedure "*per se* improper" (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). Instead summary judgment for Navistar is appropriate if the record reveals that no reasonable jury could conclude that Sprague was fired from his job because of his age (*Shager v. Upjohn Co.,* 913 F.2d 398, 399 (7th Cir.1990)).

### Facts

Richard Sprague, born on December 1, 1948 (P. 12(n)(2) ¶ 1), began working for

---

2. Sprague's: "P. 12(n)(1) ¶ —," "P. 12(n)(2) ¶ —" and "P. Ex. —";
3. deposition testimony: "[Name] Dep. —"; and
4. affidavits: "[Name] Aff. ¶ —."

Navistar (then known as International Harvester) in June 1967 (P. 12(n)(1) ¶ 5) or 1968 (D. 12(m) ¶ 5) [2] as a parts-depot trainee. (D. 12(m) ¶ 5). [3] From March 1971 to October 1987 Sprague held a series of increasingly senior positions with the company (D. 12(m) ¶¶ 6–8). In October 1987 he was transferred to the Corporate Financial Planning and Analysis group at Navistar's World Headquarters in Chicago (D. 12(m) ¶¶ 9–10) to assume the position of Financial Analyst (P. 12(n)(2) ¶ 1), a post that he held until he was fired early in 1991 (P. 12(n)(1) ¶ 10). That termination is the crux of this case: Sprague claims he was wrongfully discharged because of his age, while Navistar says his position was properly eliminated during a "company-wide reduction in force" ("RIF") (D. 12(m) ¶ 10).

Before the RIF Sprague and another Financial Analyst Philip Pearson ("Pearson") (age 41 [4]) reported to Manager of Truck Operations Analysis Dean Nowak ("Nowak") (age 37) (D. 12(m) ¶ 11). Nowak in turn reported to Director of Corporate Financial Analysis Walter Rhodes ("Rhodes") (age 52) (D. 12(m) ¶ 12). Manager of Profit/Cost Analysis James Gregorich ("Gregorich") (age 34) also reported to Rhodes (D. 12(m) ¶ 25), while Financial Analysts Tom Wilson ("Wilson") (age 43) and Linda Dalaba ("Dalaba") (age 41) reported to Gregorich (D. 12(m) ¶ 26). For his part Rhodes reported to Vice President and Controller Robert Morrison ("Morrison") (age 52) (D. 12(m) ¶ 13), who was in charge of the Corporate Controller's Office (Morrison Dep. 14; D.R. Ex. H, Doc. N2014). For ease of identification this opinion will refer to the Truck Operations Analysis and Profit/Cost Analysis units (comprising Nowak, Sprague, Pearson, Gregorich, Wilson and Dalaba) collectively as the "Group."

Sometime in the second half of 1990 Morrison and Navistar's Chief Operating Officer John Horne formulated the "Breakeven Challenge Program" (the "Program") to achieve cost reductions within the company (D. 12(m) ¶ 16; Morrison Dep. 53, Rhodes Dep. 29, 91). One major component of the Program was a company-wide RIF aimed at reducing overall labor costs (Morrison Aff. (D. Ex. B) ¶ 5; Rhodes Dep. 34–35). [5]

In December 1990 Morrison held a meeting of the departmental directors who reported to him (including Rhodes) as well as directors in Navistar's finance area to review the financial condition of the company and announce the Program (D. 12(m) ¶¶ 18–19). At the meeting Morrison asked the directors to review their departmental budgets and to consider where cost reductions could be achieved by eliminating functions, positions, personnel and discretionary expenditures (Rhodes Dep. 34–35).

It was decided at the outset that the RIF would not extend to trainees who were part of Navistar's Financial Management Development Program (the "FMDP") (P. 12(n)(2) ¶ 13; Morrison Aff. ¶ 16). Begun several years before 1991, the FMDP was adopted by Navistar to rotate recent college graduates and some existing employees through various departments in the company (P. 12(n)(1) ¶ 53; Morrison Aff. ¶¶ 12–13). FMDP trainees tended to be "young people" in comparison with the average age of Navistar's work force (Morrison Dep. 141–42, 162–63).

In December 1990 or January 1991 Rhodes met with Nowak and Gregorich, told them of Navistar's cost reduction plan and asked each to rank his Financial Analysts (D. 12(m) ¶¶ 25–26; Rhodes Dep. 38–39). [6] Nowak as-

---

2. That variance between the parties' versions is of course immaterial.

3. Where as here an assertion in Navistar's GR 12(m) statement is admitted in Sprague's GR 12(n)(1) statement either explicitly or implicitly by failure to contest the assertion, this opinion will cite only the former.

4. All ages are given as of January 1991.

5. While Sprague does not deny the existence of the Program and the RIF, he does contest the

underlying motives and the goals they were designed to attain. Sprague claims that at least as to Morrison the Program and the RIF were also devices to replace older employees with younger ones (P. 12(n)(1) ¶¶ 16–17). That will be dealt with later, but it does not at all negate the cost-cutting purpose of the RIF.

6. Sprague denies that Rhodes informed Nowak and Gregorich of the cost reduction plan (P. 12(n)(1) ¶ 25). But as is true of all too many of Sprague's submissions, the record evidence on

sessed Pearson as being more ambitious, aggressive and possessing greater analytical skills than Sprague (D. 12(m) ¶ 27). Consequently Nowak ranked Pearson first and Sprague second and conveyed that evaluation to Rhodes (*id.*).[7]

In January 1991 directors in the finance area again met to report on their RIF decisions. At that meeting an "available list" was compiled of those employees whose positions had been eliminated. Sprague's and Dalaba's names were included on the list. Also considered were possible reassignments of personnel to fill Navistar's remaining needs (D. 12(m) ¶¶ 29–32).

On January 31 Rhodes called Sprague and Nowak into his office and told Sprague that he was being terminated because his position with the company had been eliminated (D. 12(m) ¶ 44). Navistar does not contend that Sprague was terminated for "cause or inappropriate conduct" (Rhodes Dep. 20).[8] While his last actual workday at Navistar was January 31 (Rhodes Dep. 20), he was kept on the payroll until February 15 (P. 12(n)(1) ¶ 10; Rhodes Dep. Ex. 3).

During and after the RIF the composition of the Group changed considerably. Though Dalaba's position was also eliminated by Rhodes from his Corporate Financial Analysis group (D. 12(m) ¶ 32), toward the end of January 1991 she was selected by Navistar's Parts organization from the "available list"

(on which Sprague's name also appeared) to fill a finance position within that organization—a decision in which Rhodes was not consulted and played no part (D. 12(m) ¶ 43). Wilson was chosen by Director of Finance Jim Stanaway ("Stanaway") (age 45) for the Materials Management organization to fill a temporary position as an analyst within that organization (D. 12(m) ¶¶ 34, 38, 42).

Once the 1991 RIF was completed Gregorich became Manager of Financial Analysis, with supervision over Nowak and Pearson (who retained their positions) (D. 12(m) ¶ 47). James Huffman ("Huffman") (age 53) and Robert Spizzo ("Spizzo") (age 40) were transferred into the Group (also reporting to Gregorich) from the Financial Standards Policy and Procedure group, which had been eliminated during the RIF (D. 12(m) ¶ 48).[9] Finally FMDP trainee William Murphy ("Murphy") (age 33) was transferred to the Group on February 15, 1991, assigned to Truck Operations Analysis (D. 12(m) ¶ 50; P. Ex. 4 Doc. N3234).

In August 1991 Navistar reorganized its truck business into three separate divisions (Morrison Dep. 99; P. 12(n)(2) ¶ 70). At that time the Group was again reformulated. Nowak and Pearson left the Group and were replaced by Ted Zurkowski ("Zurkowski") (age 36) and Steven Gleason ("Gleason") (age 28) (P. 12(n)(2) ¶ 67; Murphy Dep. 57–58). At that point Zurkowski headed Financial Forecasting and Reporting (supervising

---

which Sprague seeks to rely (Gregorich Dep. 18–19) does not bear that out:

> Q. Had you had any communication with Wally Rhodes during 1990 regarding an upcoming cost reduction situation which may or may not include reduction in force?
> A. The only specific instance I recall was that we had to rank our employees. I don't know if that happened at late 1990 or January 1991.
> Q. Prior to the time that you were asked to rank employees, do you recall any conversation with Wally Rhodes or ... any other higher level employee regarding cost reduction or reduction in force?
> A. I'm sure we had done some work, but I don't recall any specific conversation.

That lack of recollection of a specific conversation is insufficient to create a genuine issue of fact concerning the matter, in view of the other *express affirmative testimony on that score.*

7. P. 12(n)(1) ¶ 27 "object[s]" to those facts on relevance grounds. That is of course nonsense,

given the fact that Rhodes then decided to terminate Sprague but not Pearson.

8. Sprague's most recent rated evaluation (4 years earlier—dated February 11, 1987) had assessed him overall as "A+" (next to the top grade of "S"), where "A" stands for "Achievement expected of an experienced and qualified individual" and "+" "Denotes performance which surpasses that of most other peers" (Ex. 4 of P.Ex. 2). Sprague's last review a year before his termination (on February 12, 1990) was less glowing: a simple written comment by Nowak that Sprague "met the goals and objectives that I had set for him in 1989" (Ex. 5 of P.Ex. 2).

9. Again P. 12(n)(1) ¶ 48 "object[s]" on relevance grounds. And again that objection is meritless, for the evidence bears on Sprague's contention that he was effectively replaced by a younger employee.

Gleason and Murphy), while Gregorich now headed Business Profitability and Analysis (supervising Huffman, Spizzo, Wilson [who had apparently returned to the Group] and Nick Noto (age unknown)) (P. 12(n)(2) ¶ 71; Murphy Dep. 57–58; Rhodes Dep. Ex. 1 Doc. N2120). Rhodes was no longer in charge of the Group, which now fell under the supervision of Jim McIntosh (P. 12(n)(2) ¶ 67; Rhodes Dep. Ex. 1 Doc. N2120).

In April 1992 Zurkowski left Navistar, and in May or June of that year Murphy was promoted to Zurkowski's old position (P. 12(n)(2) ¶ 71; Rhodes Dep. Ex. 1 Doc. N2123). On June 22, 1992 Bruce Glanville ("Glanville") (age 34) took over Murphy's Financial Analyst position, so that Murphy now supervised Glanville and Gleason (P. 12(n)(2) ¶ 71; P.Ex. 4 Doc. N3266).

So much for the facts. This opinion now turns to the evaluation of those facts in terms of ascertaining the existence or nonexistence of any genuine issue of material fact.

### Legal Framework

Under ADEA the employee always carries the burden of proving "that he would not have been discharged 'but for' his employer's motive to discriminate against him because of his age" (*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991)). By now the dual judicial approaches to that problem are so familiar that this opinion will do no more than to identify them in outline form.

One of those approaches is the more-recently-announced mixed-motives analysis in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), appropriate where both discriminatory and non-discriminatory considerations have influenced an employer in making the

adverse employment decision. *Price Waterhouse, id.* at 232, 109 S.Ct. at 1780 says that its division of the burdens of proof between plaintiff and defendant applies "when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives." Of course when a court rules on a motion for summary judgment, nothing "has been shown": Factual proofs have not been weighed by a trier of fact. Because *Price Waterhouse* (unlike the formulation next discussed) involves a shift in the burden of persuasion, and thus sets a higher hurdle for the employer to overcome, it comes into play only when there is a reasonable inference that the employer's adverse employment decision was the product of "a mixture of legitimate and illegitimate motives."[10]

As for the more familiar earlier-announced approach, it was established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and reaffirmed in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). It is used where "*either* a legitimate *or* an illegitimate set of considerations lead to the challenged [employment] decision" (*Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788).[11]

As already indicated, the *McDonnell Douglas–Burdine* formulation is more demanding on the plaintiff employee. If in the last step of its ping-pong approach the employee does show that the employer's proffered reasons are mere pretext, the trier of fact is permitted "to infer the ultimate fact of intentional discrimination," though such an inference is not compelled because the "ultimate burden of persuasion" remains with the

---

**10.** It is awkward to continue to repeat Sprague's burden on the current motion in terms of his merely having to create reasonable inferences—though that is of course accurate, the awkwardness is created by the fact that so much of the case law (not necessarily written in the summary judgment context) speaks of what the employee must "prove" or must "show." Accordingly, whenever this opinion does employ either of those "prove" or "show" locutions it should be understood in terms of Sprague's lesser burden of having to create reasonable inferences, not

actually having to bear the burden of persuasion. That inference-creating burden is the test that this Court has used throughout.

**11.** While *Price Waterhouse* and *McDonnell Douglas–Burdine* address allegations of race discrimination in violation of Title VII, their methods of analysis also apply to ADEA cases (*Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 658 (7th Cir.1991) (en banc) and *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988)).

employee at all times (*St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)). But the important factor is that what the employee must do to avoid summary judgment in that scenario is to create the reasonable inference of employer pretext.

■ By contrast, when an employee creates a reasonable inference (by either direct or circumstantial evidence) of age discrimination in the *Price Waterhouse* situation, the burden of persuasion shifts to the employer and the employee need not rebut the employer's claim (*Berlett v. Cargill, Inc.,* 780 F.Supp. 560, 562–63 (N.D.Ill.1991)). Hence this opinion will first examine the evidence in terms of the *Price Waterhouse* framework and the Rule 56 standards, even though Sprague has not organized his presentation in those terms.[12]

### Illegitimate Motive?

■ Under *Price Waterhouse* the employee's initial burden is to show the existence of the employer's "illegitimate motive": In ADEA terms, that age was a "substantial factor" in his or her discharge.[13] That was fleshed out in the plurality opinion, 490 U.S. at 250, 109 S.Ct. at 1790 (adapted to ADEA):

> [I]f we asked the employer at the moment of the [employment] decision what its reasons were and if we received a truthful response, one of those reasons would be that the ... employee was [at least 40 years of age].

In his opposition to Navistar's summary judgment motion, Sprague endeavors to raise a genuine issue on that question by offering as evidence (1) statements made by Morrison and (2) circumstantial evidence that Sprague was replaced by Murphy. Each of those will be assessed in turn.

### Morrison's Statements

■ When questioned at his deposition about Navistar's treatment of FMDP trainees compared with that accorded longer service employees, Morrison made several references to the age of Navistar's work force and its need for younger people (Dep. 141–42, 151–52, 162–63). While not a necessary inference, a reasonable jury could infer that a person with that perspective would be motivated by a discriminatory age-based bias in selecting employees to be terminated during Navistar's 1991 RIF. One possible interpretation of Morrison's statements is that he viewed the age composition of Navistar as a "problem" (Dep. 163) whose solution was "to bring ... young people" into Navistar to insure its future economic viability as "a continuing company" (Dep. 141). It is a permissible inference that such a view would influence Morrison in choosing individuals to be terminated during a company-wide RIF whose avowed purpose was "to improve the economic conditions and revitalize the company" (D. 12(m) ¶ 16).

But for such statements to be probative of a discriminatory basis for *Sprague's* discharge, he must show a causal connection between the expressed view and the decision to discharge *him.* As the plurality in *Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. at 1791 (again adapted to speak in ADEA terms) explains:

> Remarks at work that are based on [age] stereotypes do not inevitably prove that [age] played a part in a particular employment decision. The plaintiff must show that the employer actually relied on [his age] in making its [employment] decision.

Our Court of Appeals has made it crystal clear that for such statements to be probative of a discriminatory animus, they must be made by the person or persons making the contested employment decision (see, e.g.,

---

12. Indeed, *Sprague's* counsel has not even referred to *Price Waterhouse,* though it would ease his task if it were applicable (as he surely believes it to be, given the arguments he *does* advance).

13. Four Justices in *Price Waterhouse* stated that discrimination need be only a "motivating factor" of the employer's decision. However, a

majority ruling of the Court requires the inclusion of the concurrence of one or both of Justices O'Connor and White. Because both of them stressed that a discriminatory motive must be a *"substantial* factor" in the employer's action (490 U.S. at 259, 265, 109 S.Ct. at 1795, 1798 (White and O'Connor, JJ., concurring separately)), that meaning must be read into the term "motivating factor."

*McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 687 (7th Cir.1991); *LaMontagne v. American Convenience Prod., Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984)). And where Sprague fails utterly is that Morrison was really not the decisionmaker responsible for Sprague's termination. As the executive overseeing Navistar's finance area, Morrison technically had the ultimate decision as to who would be terminated in that area during the 1991 RIF (Morrison Dep. 163–64; Rhodes Dep. 90). However, such formal authority does not equate to any *actual* participation in the decision to terminate Sprague.

To highlight the critical distinction, it is worth framing the scenario in the manner most reasonably favorable to Sprague's position. Assume that the Program, economically motivated to establish a RIF to create a leaner organizational structure for Navistar, was intended by Morrison to create a leaner *and younger* structure. But if the individual keep-or-fire decisions were actually made at lower levels of authority, and if one of those individual decisions was made entirely in terms of merit untainted by considerations of age, the target of that adverse decision would have no viable ADEA claim.

That describes Sprague's situation to a T, even ascribing (in inferential terms) an impermissible motivation to Morrison. When it came to paring the Group to a more streamlined size, each supervisor was asked to evaluate the people reporting to him. Nowak gave Pearson higher marks than Sprague— an honestly-made evaluation on the merits— just as Gregorich gave Wilson higher marks than Dalaba. When that information was given to Rhodes, the two lower-rated people were put on the list for termination. That is *not* the stuff of which a viable ADEA claim can be molded.[14]

In an effort to avoid that inexorable result, Sprague tries to put Morrison into the posture of the decisionmaker who earmarked Sprague for discharge during the RIF by pointing to a document captioned "CCO [Corporate Controller's Office] Organizational Analysis[,] 1991 Staff Proposal[,] October 3, 1990" (the "Organizational Analysis," D.R. Ex. H). Page 1 of that document, headed "Net Fallout from Current Organization," lists "positions that could possibly be eliminated" as part of the RIF (Morrison Dep. 32; D.R. Ex. H Doc. N2009). Included are all the Financial Analysts who worked in the Group as of that date—the four persons evaluated as described in the preceding paragraph.

It is unclear who authored the Organizational Analysis. Morrison believes that possibly "Rhodes' organization" prepared it (Morrison Dep. 31). For his part Rhodes said he did not see the document until the day before his deposition (Rhodes Dep. 25), surmising that was so because the document also listed him for possible "[f]allout" (i.e., elimination) from his position (Rhodes Dep. 31; D.R. Ex. H Doc. N2015). In any case, there is no evidence to place the Organizational Analysis on Morrison's doorstep—at most, all that can be said is that he believes that the document was used in determining the staffing and structure of the Corporate Controller's Office for 1991 (Morrison Dep. 30, 34–35).

But that is really irrelevant for the analytical reasons already stated here. *Everyone* in the same area of activity (each of the four Financial Analysts) was shown as potentially expendable in formulating the RIF—there is not the whisper of any inference that the entire area of activity was included because all of its people had recently passed the age 40 watershed. That being so, the document is a red herring. Because the choice as between Sprague and Pearson was based on considerations other than age and was made by persons other than Morrison, Sprague's claim fails to the extent that he attempts to rely on Morrison's asserted mindset.

*Murphy's Situation*

■■■ With one string to Sprague's illegitimate-motive bow thus broken (or really

---

14. It is noteworthy that all four of the people being evaluated ranged between the ages of 41 and 43 (in the earliest age range given ADEA protection). That being so, Sprague's position would necessarily imply that no matter on whom the termination axe fell, and no matter that the choice of whom to terminate was entirely based on merit, the fired employee must nonetheless recover under ADEA. Reductio ad absurdum.

missing entirely), it remains to examine his other claimed string: the contention that Morrison's alleged age-discriminatory animus ·led to Sprague's replacement by 33–year–old FMDP trainee Murphy. That contention requires Sprague to create a twofold set of reasonable inferences:

· 1. that Murphy ·replaced Sprague; and

2. that the replacement was decided upon by Morrison.

As for the first of those premises, Sprague's showing is thin at best. It is true that the proposal outlined in the Organizational Analysis (dated, it will be recalled, in October 1990—*four months before the RIF* was implemented—contained an entry reading "W.J. MURPHY—TRANSFERRED TO FINANCIAL/OPERATIONAL ANALYSIS" (D.R. Ex. H Doc. N2020; and see *id.* Doc. N2028). But the record is at worst unclear as to whether "Financial/Operational Analysis" is the same department as the one in which Sprague worked—or more importantly as to whether the job projected for ·Murphy in that document, or the one that he received shortly after Sprague's departure, was essentially the same one that Sprague had held. Indeed, the evidence really cuts the other way.

It is unnecessary to explore any ambiguities created by departmental or job titles (or even by reporting responsibilities) in the restructured Navistar organization—after all, the critical factor for determining the existence or nonexistence of an age-motivated replacement is not the label that the position bears but its actual content. And in that respect Sprague traces a tortuous path, forced to depend upon building inference on inference. This Court has reviewed the parties' contentions and all of the evidence underlying them, and it is left with the abiding convictions that despite the similarity in their job titles, the vast bulk of what Sprague had done was performed after he left by persons other than Murphy, while Murphy's activities when he joined the restructured department were largely different from what Sprague had been doing.

All the same, the simultaneous timing of the two events (Murphy's first day in Nowak's unit was the same as Sprague's official termination day: February 15, 1991), coupled with the troublesome nature of a legal rule that would require an ADEA plaintiff to show that his or her replacement did precisely the same work as the plaintiff did before termination,[15] lead this Court to assume arguendo that Sprague has generated a reasonable inference of his replacement by Murphy. That assumption will be indulged despite the attenuated nature of the proof in that respect.

But that assumption alone is not enough, for the mere fact that a protected employee (one past his or her fortieth birthday) was replaced by an unprotected employee (someone not yet there) does not by itself create an inference of age discrimination (*Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 661 (7th Cir. 1993), quoting *LaMontagne*, 750· F.2d ·at ·1412–13; *Shager*, 913 F.2d at 400). As in all ADEA cases, Sprague must also offer proof that the adverse employment decision, here replacement, was motivated by a discriminatory bias.

In that regard, just as there is no reasonable inference that connects Morrison (the only person even arguably identified with an age-related motivation) to the Organizational Statement that listed Murphy's possible transfer, so there is no reasonable inference linking Morrison to the ultimate decision implementing that transfer. And just as Morrison's asserted mindset did not provide Sprague with a viable ADEA claim where the adverse decision terminating him was not ascribable to Morrison, so the same asserted mindset does not generate an ADEA claim based on Murphy's assumed replacement of Sprague. So the generous (maybe overly generous) inference that Murphy replaced Sprague does not do the job for Sprague either.

*Summary*

Sprague has struck out in his effort to create the inference that his termination was

---

15. Such a rule would make it too easy for employers to circumvent the strictures of the ADEA by the expedient of mixing up job responsibilities · among workers in a group after having replaced some terminated employees with younger workers (*Shager,* 913 F.2d at· 400).

occasioned even in part by the "illegitimate motive" of his age. That negates any need to pursue the *Price Waterhouse* analysis under which the burden would have shifted to Navistar to show as a matter of law "that it would have made the same decision" to terminate Sprague "even if it had not taken the plaintiff's [age] into account" (*Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794 (again adapted to ADEA)). And because *Price Waterhouse* presents a less demanding burden for plaintiffs than the *McDonnell Douglas–Burdine* approach, it would appear that Sprague must lose under the latter too. Nonetheless that approach will be examined as well.

### McDonnell Douglas–Burdine *Analysis*

■ Where a plaintiff alleges age discrimination in connection with a defendant's reduction in its work force, *Konowitz v. Schnadig Corp.,* 965 F.2d 230, 232 (7th Cir.1992) teaches that a prima facie case has been established if the plaintiff can show:

> that he was: (1) in a protected class; (2) performing the job satisfactorily; (3) nevertheless the subject of a materially adverse employment action; and (4) others outside of the protected class were treated more favorably.

There is no question that Sprague has established the first three elements. And as for the fourth, the earlier-stated arguendo assumption that Murphy served as Sprague's replacement is enough to meet that component of the prima facie case.

[9] Under *McDonnell Douglas–Burdine* the burden of production then shifts to Navistar to articulate a legitimate reason for firing Sprague. And that is accomplished at least as easily as Sprague surmounted his initial hurdle: Navistar can simply point to its business decision to institute a RIF and to Nowak's ranking of Sprague behind Pearson on their respective merits. That leads to the third and last step in the analysis: the question whether Navistar's proffered reasons are or are not pretextual.

■ On that score, as already suggested, the extended discussion in the *Price Waterhouse* section of this opinion (the portion that conclusively demonstrates a negative answer to the question "Illegitimate Motives?") also mandates a negative answer to the question of pretext vel non. Because Sprague has failed to create any reasonable inference that Morrison's arguably age-related views had any causal nexus with Nowak's rankings and Sprague's consequent termination, Sprague has equally failed to create any reasonable inference of pretext as well. So as foreshadowed by Sprague's lack of success in the *Price Waterhouse* matrix, Navistar also prevails in *McDonnell Douglas–Burdine* terms.

### Sprague's Other Contentions

To this point this opinion has focused on Sprague's principal argument in support of his age discrimination claim, and it has demonstrated why he comes up empty in that respect. But he has advanced several other makeweight contentions as well. They need little discussion because of their patent lack of merit. Although it may have been equally logical to address them earlier during the main discussion of the case law requirements and of Sprague's inability to meet those requirements,[16] this Court has opted to collect the brief treatment of those added contentions here:

■ 1. Gregorich's awareness of the age and health care issues of Navistar's work force (P. 12(n)(2) ¶ 16): Because Gregorich was not a decisionmaker with regard to Sprague's termination, anything that he knew or may have said is not probative of a discriminatory animus on Navistar's part (*McCarthy,* 924 F.2d at 687).

[12] 2. Morrison's awareness of the health care costs of older workers and of a new Financial Accounting Standards Board rule requiring Navistar to project health care costs of retired workers from retirement to date of death (P. 12(n)(2) ¶¶ 19–22): Sprague has offered no evidence that either of those issues was con-

---

16. Those other contentions are of course relevant to Sprague's failure to create the necessary favorable inference of age discrimination.

sidered by anyone (decisionmaker or otherwise) in connection with the reductions decided upon as part of the 1991 RIF. Mere speculation, unsupported by any evidence that age-based cost savings motivated Navistar in firing Sprague, is insufficient to overcome Navistar's summary judgment motion (*Visser*, 924 F.2d at 658; *LaMontagne*, 750 F.2d at 1410–11).

3. Attaching ages to the names of personnel discussed at a January 1991 meeting where final decision to eliminate certain individuals was made (P. 12(n)(2) ¶¶ 33–34): Mere knowledge of an employee's age does not generate an inference that an adverse employment decision was the result of age-based bias (*Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992)). To hold otherwise would place an employer in a Catch–22 situation in which the retention of records that the employer must maintain to negate age discrimination would somehow provide evidence of such a prohibited mindset.

4. Statistical results of firings, hirings and promotions before, during and after the 1991 RIF: Sprague offers several small-sample (and in some cases distorted) computations as purported statistical showings that within the Corporate Controller's Office around the time of the RIF, unprotected employees enjoyed preferential treatment when compared with protected employees—in other words that the 1991 RIF had a disparate impact on protected workers.[17] That sketchy offering need not detain the discussion: Not only has Sprague chosen to use small samples (making any statistical conclusions suspect), but he has presented *no* evidence as to the overall age composition of employees of the Corporate Controller's Office during the period—information essential to any inquiry as to whether Navistar's employment decisions did in fact have a disparate impact (see *Fisher v. Transco Serv.–Milwaukee, Inc.*, 979 F.2d 1239, 1244–45 (7th Cir.1992)).

5. Refusal to transfer Sprague to one of four post-RIF openings in the Materials Management organization (P. 12(n)(2) ¶¶ 51–53): Sprague urges that Navistar's qualifications for the jobs (manufacturing experience) was in fact not necessary, and that anyway he had the requisite experience. Neither of those contentions survives scrutiny.

To begin with, there is no probative basis for questioning the statement by Stanaway (who actually filled the four positions) that he was looking for individuals with "experience in the Materials Management organization or a background in manufacturing" (Stanaway Aff. (D. Ex. C) ¶ 7). All four individuals transferred into the positions satisfied one or both of those criteria (*id.* at ¶¶ 9–12). In an effort to counter that, Sprague seeks to cite the affidavit by Zurkowski, one of those four individuals selected by Stanaway (P. 12(n)(2) ¶ 53; Zurkowski Aff. (P.Ex. 5) ¶¶ 6–7).

But Zurkowski's after-the-fact assessment of the requirements for his job does not raise a genuine issue as to the criteria that Stanaway—the only relevant decisionmaker—relied on in making his initial selection. On summary judgment an employer's personnel decisions are reviewed only to see that there was a genuine and honest effort to make them based on "performance-related considerations" (*Williams v. Williams Elec., Inc.*, 856 F.2d 920, 924 (7th Cir.1988)). Sprague has offered no evidence that Stanaway failed to do so. This Court "does not sit as a super-personnel department that reexamines an entity's business decisions" (*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986); accord, such cases as *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1392 (7th Cir.1990)).

As for Sprague's argument based on his own qualifications (P. 12(n)(2) ¶ 53), he points only to his own assessment of his abilities [18] and to the wholly conclusory

---

**17.** Disparate impact theory has been applied to ADEA cases, as in other employment discrimination cases (*Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161, 1163 (7th Cir.1992)).

**18.** In that respect he refers to his own deposition testimony, his own affidavit and his own resume (*id.*).

opinion expressed in Zurkowski Aff. ¶ 7. Sprague's "self-interested assertions concerning [his] abilities are not in themselves sufficient to raise a genuine issue of material fact" as to whether he was qualified to fill any of those positions (*Williams,* 856 F.2d at 924). And the statements of a fellow employee that do not "explicitly weigh [Sprague's] abilities against those of" the four transferred employees cannot create a genuine issue as to whether Navistar properly weighed the "performance-related considerations" that Stanaway indicated as relevant (*id.*).

6. Refusal to consider Sprague for job openings (P. 12(n)(2) ¶¶ 74–75): Sprague similarly claims that Navistar improperly refused to consider him for internal job postings for which he was qualified. But once again Sprague relies only on his self-assessments of his own abilities, which as stated above are insufficient to raise a genuine issue of material fact (*Williams,* 856 F.2d at 924).

This Court has commented in other opinions about the lack of weight to be ascribed to contentions that require the drawing of a combination of attenuated inferences: the multiplication of very small fractions that generate a product that approaches (though of course it cannot ever reach) the vanishing point. This set of contentions by Sprague illustrates another mathematical truism: No matter how many zeros are added together, their sum remains zero. None of Sprague's makeweight arguments dealt with in this section alters the result signaled earlier.

### Conclusion

There are no genuine issues of material fact to support a reasonable inference that Navistar violated the ADEA in terminating Sprague as part of its business-driven RIF, and Navistar is entitled to a judgment as a matter of law. This action is dismissed.